Argued and submitted September 17, 2012; resubmitted January 7, 2013, decision of Court of Appeals and judgment of post-conviction court affirmed March 20, petitioner on review's petition for reconsideration filed April 22, allowed by opinion June 12, 2014
See 355 Or 598, 330 P3d 595 (2014)

## MARCO ANTONIO MONTEZ,
*Petitioner on Review,*

*v.*

## Stanley CZERNIAK,
Superintendent,
Oregon State Penitentiary,
*Respondent on Review.*

(CC 97C12376; CA A130258; SC S059138)

322 P3d 487

Daniel J. Casey, Portland, argued the cause and filed the briefs for petitioner on review.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Mary H. Williams, Deputy Attorney General, Anna M. Joyce, Solicitor General, Kathleen Cegla, Assistant Attorney General, and Pamela Walsh, Assistant Attorney General.

Before Balmer, Chief Justice, Walters and Baldwin, Justices, and Riggs and Durham, Senior Judges, Justices *pro tempore*.**

BALMER, C. J.

---

** De Muniz, Kistler, Linder, Landau, and Brewer, JJ., did not participate in the consideration or decision of this case.

**BALMER, C. J.**

Petitioner was convicted of aggravated murder in 1988 and, following a 1992 penalty-phase retrial, was sentenced to death for that crime. Petitioner now seeks post-conviction relief, arguing that he received constitutionally inadequate assistance of counsel during that 1992 penalty-phase proceeding. The post-conviction court denied relief and the Court of Appeals affirmed that judgment. For the reasons set out below, we also affirm.

## I. HISTORY AND PROCEDURAL BACKGROUND

In 1987, petitioner and another man beat, raped, and sodomized a female victim in a Portland motel room. When the victim resisted, petitioner responded by forcing his fist into her anus, causing her to bleed profusely. The two men then tied the victim's arms behind her back and strangled her to death with a fabric noose that they had fashioned. After carrying her body to the bed, the pair doused her corpse in flammable liquid and ignited it. Firefighters discovered the body shortly thereafter when they responded to the resulting fire.

In 1988, a jury convicted petitioner of first-degree arson, abuse of a corpse, and three counts of aggravated murder. At the time of the penalty-phase proceedings that followed, ORS 163.150 (1987) required juries in aggravated murder cases to consider only three penalty-related issues: (1) whether the conduct that had killed the victim was undertaken deliberately and with a reasonable expectation that death would result; (2) whether there was a probability that the defendant would commit further acts of criminal violence so as to constitute a continuing threat to society; and (3) if warranted by the evidence, whether the conduct that had killed the victim was an unreasonable response to provocation on the victim's part. Following the presentation of evidence by the parties, the jury answered the applicable questions[1] in the affirmative, and the trial court sentenced petitioner to death.

---

[1] Petitioner did not raise any provocation claims at his trial. Therefore, that issue was not submitted to the jury during the initial penalty phase of his trial or during the second penalty-phrase proceeding following remand from this court.

On automatic and direct review, this court affirmed petitioner's convictions but reversed and remanded his death sentence. *State v. Montez*, 309 Or 564, 789 P2d 1352 (1990) (*Montez I*). Citing its then-recent decision in *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den*, 498 US 879 (1990) (*Wagner II*),[2] the court held that the trial court had improperly denied petitioner's request for a jury instruction that would have allowed the jury to find that mitigating evidence justified imposition of a life sentence for petitioner rather than death. *Montez I*, 309 Or at 609-10.

On remand in 1992, a newly empanelled penalty-phase jury was instructed to answer the following questions:

"Was the conduct of the defendant that caused the death of the deceased committed deliberately and with a reasonable expectation that death would result?

"Is there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

"Should the defendant receive the death sentence[?]"

*State v. Montez*, 324 Or 343, 345-46, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997) (*Montez II*) (setting out penalty-phase jury instructions on retrial). As to the last question, the jury was instructed that

"you should answer this question no if you find that there is any aspect of the defendant's character or background or any circumstances of the offense that you believe would justify a sentence less than death."

*Id.* at 346.

---

[2] In *Wagner*, this court held that mitigation evidence in aggravated murder cases must allow for "the jury's exercise of a reasoned moral response to the question 'should defendant receive a death sentence?'" 309 Or at 19. The court went on to explain that, in so holding,

"we are asking the jury, in making its finding, to consider any mitigating aspect of defendant's life, alone or in combination, not necessarily related causally to the offense. This does no more than to provide the sentencing jury with the data traditionally available to the sentencing judge under the discretionary sentencing model for criminal cases."

*Id.* at 20.

The jury was presented with extensive evidence regarding aggravating and mitigating factors related to petitioner's background, his character, and his crime. As petitioner summarizes in his brief, the state's case for demonstrating that petitioner should be sentenced to death focused on (1) the brutality exhibited by petitioner in his sexual assault, torture, and murder of the victim; (2) the fact that petitioner was on temporary release from prison when he committed those crimes; (3) the aggression petitioner demonstrated toward his peers as a child and the belligerent, deceitful, and manipulative behaviors he exhibited toward adults during that same period; (4) petitioner's lifetime of drug and alcohol abuse that was never successfully treated; (5) petitioner's criminal history, marked by numerous assaults in different states and his failure to comply with conditions of probation; (6) petitioner's altercations with various prison inmates; (7) petitioner's alleged threats against his co-defendant; and (8) the fact that petitioner had been diagnosed with an anti-social personality disorder, a condition that increased the likelihood of his future dangerousness.

The mitigation case that petitioner's counsel presented in response focused on (1) the childhood neglect and abuse petitioner had endured at the hands of his natural and foster parents; (2) the post-traumatic stress disorder (PTSD) he suffered as a result, a condition that would be treatable in prison; (3) the absence of any counseling component in the substance abuse treatment programs made available to and used by petitioner; (4) the remorse petitioner expressed to others for his crime; (5) the difficult conditions of petitioner's confinement that, in turn, led to altercations with other prison inmates; (6) testimony from several inmates who indicated that they had instigated those altercations with petitioner; and (7) evidence of petitioner's efforts to better himself in prison and help others to do the same.

Following presentation of evidence at the penalty-phase retrial, the jury answered the required questions in the affirmative and the trial court again imposed a death sentence. In 1996, this court affirmed that judgment in *Montez II*, 324 Or 343.

In 1997, petitioner filed his first petition for post-conviction relief. Over the next seven years, the parties presented and litigated a plethora of pre-hearing issues and motions. During that period, petitioner amended his initial post-conviction petition nine times and ultimately raised numerous claims regarding the allegedly ineffective assistance of counsel he received during his 1992 penalty-phase retrial. Petitioner's hearing, in which he bore the burden of proving the facts alleged in his petition by a preponderance of the evidence, ORS 138.620(2), began in April 2004 and encompassed four days of testimony over a three-month period. The post-conviction court subsequently entered a judgment denying relief in October 2005.

Petitioner appealed that judgment. Following extensive briefing and oral argument, the Court of Appeals affirmed the post-conviction court's judgment in September 2010. This court allowed petitioner's subsequent petition for review.

## II.   INADEQUATE ASSISTANCE OF COUNSEL: LEGAL PRINCIPLES AND STANDARD OF REVIEW

Criminal defendants in aggravated murder cases have a constitutional right to counsel under Article I, section 11, of the Oregon Constitution and under the Sixth Amendment to the United States Constitution. Under both constitutions, "the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance." *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005). Those constitutional provisions require "adequate performance by counsel" concerning the "functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981); *see also Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (Sixth Amendment right to counsel requires not just counsel, but "effective" counsel). This court, while interpreting and applying Article I, section 11, independently of the United States Supreme Court's interpretation of the Sixth Amendment, has nevertheless recognized that the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those

for determining the effectiveness of counsel under the federal constitution. *See State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008) (equating "effective" assistance with "adequate" assistance).[3]

In evaluating whether a defendant's lawyer has rendered inadequate assistance under the Oregon Constitution, our analysis ordinarily proceeds in two steps:

> "First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his lawyer] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial."

*Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002) (internal citations omitted). In doing so, we "make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Id.* at 360. We will not "second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). As this court's case law has made clear,

> "[t]he constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided."

*Krummacher*, 290 Or at 875.

As noted, the United States Supreme Court has articulated the standard that we employ under the United States Constitution. To prevail on a Sixth Amendment claim regarding the ineffectiveness of counsel, a petitioner must demonstrate that his or her trial counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 US at 688. Appellate courts reviewing Sixth Amendment claims "must consider the totality of the evidence before the

---

[3] In evaluating whether a petitioner in a post-conviction proceeding was denied his right to adequate counsel, we first consider his claims under Article I, section 11, of the Oregon Constitution. *Lichau v. Baldwin*, 333 Or 350, 358-59, 39 P3d 851 (2002). If the petitioner prevails under Article I, section 11, we do not consider his claims under the Sixth Amendment. *Id.* at 365 n 3.

judge or jury." *Id.* at 695. At the end of the day, the court must evaluate the reasonableness of counsel's representation "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison,* 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986). In doing so, we do not inquire into counsel's subjective state of mind; instead, we inquire into the objective reasonableness of counsel's performance. *Harrington v. Richter,* 562 US 86, 110, 131 S Ct 770, 790, 178 L Ed 2d 624 (2011).

With regard to prejudice, petitioners

"must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"

*Richter,* 562 US at 104, 131 S Ct at 787-88 (quoting *Strickland*; internal citations omitted).

This court's review of a post-conviction court's determinations is not open-ended. We review such proceedings for errors of law. *Peiffer v. Hoyt,* 339 Or 649, 660, 125 P3d 734 (2005). A post-conviction court's findings of historical fact are binding on this court if there is evidence in the record to support them. *Lichau,* 333 Or at 359. If the post-conviction court failed to make findings of fact on all the issues—and there is evidence from which such facts could be decided more than one way—we will presume that the facts were decided consistent with the post-conviction court's conclusions of law. *Id.*

### III.  PETITIONER'S CLAIMS ON REVIEW

On review, petitioner raises a number of different claims related to his inadequate assistance of counsel allegations. We address those claims below, grouped into five broad categories: (1) claims related to omitted mitigation evidence, (2) claims related to trial counsels' disclosure of petitioner's previous death sentence, (3) claims related to

trial counsels' use of inmate witnesses, (4) claims related to omitted evidence regarding petitioner's future dangerousness, and (5) claims related to trial counsel and the jury.

## A. *Claims Related to Omitted Mitigation Evidence*

We begin by setting out the mitigation-related steps taken by petitioner's lawyers in preparation for petitioner's penalty-phase retrial, and the strategy that evolved as a result. Counsel initially had engaged the trial court in an effort to secure funds for a specialized "mitigation expert" in addition to the defense team's regular investigator. Those requests were denied. Counsel subsequently dispatched their investigator to petitioner's childhood home in Minnesota to gather facts concerning his formative years. Counsel also retained licensed clinical psychologist Dr. Walker, a recognized expert in battered-child syndrome and PTSD to examine petitioner. Dr. Walker, in turn, referred counsel to Dr. Appel, a neuropsychologist who, after reviewing data generated by Dr. Walker, opined that a neuropsychological assessment of petitioner would not provide useful mitigation evidence.

Defense counsel nevertheless engaged a second neuropsychologist, Dr. Goldmann, to evaluate petitioner. Dr. Goldmann indicated that he would conduct a screening examination of petitioner and, should that examination reveal signs of brain injury, would continue his evaluation. Absent indications of brain injury at the screening, he stated, a full assessment would be unnecessary. Dr. Goldmann went on to evaluate petitioner over a two-day period, administering tests that were "particularly sensitive to deficits seen in brain-injured individuals;" he found none. In an affidavit submitted during defendant's post-conviction proceedings, Dr. Goldmann observed:

> "In my experience, it is not only unlikely but improbable that deficits will be found on a full neuropsychological evaluation when the results of the screening battery were normal. If one conducts enough tests, however, one can usually find an anomaly, simply because the statistical chance of finding a significant result increases with the number of tests administered."

Ultimately, he concluded that "[i]t was my opinion in 1992 that Mr. Montez did not suffer from brain injury in any form."

Finally, counsel retained Dr. Jacobsen, a medical doctor who was an expert in addiction, to determine whether petitioner suffered from fetal alcohol syndrome and would be amenable to treatment in prison. Dr. Jacobsen's examination also failed to find any evidence of brain damage.

The centerpiece of the mitigation strategy that resulted from the input of those experts focused largely on the harsh upbringing and physical abuse that petitioner had suffered as a child, factors that had caused him to be diagnosed with acute PTSD. Defense counsels' mitigation case encompassed nine days of testimony, beginning with petitioner's father and siblings, various foster parents, and mental health care professionals and social workers who had interacted with petitioner when he was a child.

The picture painted by their testimony was of an early childhood that was beyond bleak. It was dominated by an alcoholic mother who had utterly failed to care for her children, frequently leaving petitioner and his two siblings alone for days to fend for themselves. Mother had, on at least two occasions, tried to kill the children and herself; once using gas from the oven, and once by setting the family house on fire after igniting the bed of petitioner's sister while the child slept in it.

An early foster care placement aggravated rather than alleviated the level of childhood abuse petitioner suffered. Petitioner's younger brother described how their placement together in one foster home was marked by frequent punishments in the form of beatings with belts or fists, daily verbal abuse, and withheld food. The brother recounted one incident in which petitioner was kicked against the foster family's automobile and another in which petitioner was accidently knocked unconscious.

Subsequent foster care providers described petitioner as a "very damaged" and "angry" child tormented by night terrors and given to seizure-like episodes during which his body would become rigid and he would hyperventilate—

sometimes for hours—while remaining unresponsive to external stimuli. Medication eventually controlled the seizures but, as social workers and counselors who worked with petitioner during that time explained, nothing seemed to diminish petitioner's anger at his mother, nor his propensity to react violently if physically hurt while playing with others.

Petitioner's counsel followed that block of testimony with three days of testimony from licensed clinical psychologist Dr. Walker. Dr. Walker had been given all the mitigation-related information defense counsel had gathered regarding petitioner's case. She reviewed various agency and treatment center reports concerning petitioner, his family history, educational records, medical records, drug treatment records, and police reports. She also conducted a complete assessment of petitioner's childhood history and scrutinized prior psychological test results showing his early cognitive abilities, brain function, and personality. Finally, Dr. Walker evaluated petitioner in person for two days, administering a variety of tests designed to determine present cognitive abilities, neuropsychological problems, and personality characteristics.

Ultimately, Dr. Walker testified that she had diagnosed petitioner with PTSD and battered child syndrome. She described how petitioner had been severely battered from early childhood through adolescence, noting the abuse petitioner had suffered with his natural parents, his abusive foster-home placements, his experiences in residential treatment, and his history of head injuries, seizures, and night terrors. Dr. Walker also provided a provisional diagnosis of substance-abuse personality disorder, noting mother's alcoholism and the difficulties created by fetal exposure to drugs and alcohol, as well as petitioner's own drug- and alcohol-abuse problems. Walker testified that petitioner's pattern of substance abuse was an attempt to alleviate the pain of his childhood trauma, trauma that had contributed, in Dr. Walker's opinion, to a "Dr. Jekyll and Mr. Hyde personality" marked by periods of depression, irritability, anxiety, and explosiveness. Petitioner's traumatic childhood and the PTSD he suffered as a result, Dr. Walker opined,

accounted for the extreme violence petitioner had exhibited in murdering the victim because, at the time, petitioner's condition had left him unable to differentiate between the actions that were occurring around him and the childhood trauma he was reliving in his mind.

In Dr. Walker's expert opinion, however, petitioner's PTSD and his tendency toward antisocial conduct were treatable in a closely controlled environment such as prison. That opinion was echoed by Dr. Colistro, a prison staff psychologist who specialized in treating violent offenders incarcerated in Oregon correctional institutions. Dr. Colistro testified that (1) petitioner was amenable to treatment, (2) treatment was available for him in prison, and (3) treatment would lessen the risk that petitioner would commit future acts of violence.

On review, petitioner acknowledges the breadth of the mitigation case made on his behalf. Drawing generally, however, on mitigation-related ineffective-assistance-of-counsel decisions from the United States Supreme Court—including *Sears v. Upton*, 561 US 945, 130 S Ct 3259, 177 L Ed 2d 1025 (2010), *Porter v. McCollum*, 558 US 30, 130 S Ct 447, 175 L Ed 2d 398 (2009), and *Rompilla v. Beard*, 545 US 374, 125 S Ct 2456, 162 L Ed 2d 360 (2005)—petitioner nevertheless contends that the fact that *some* mitigation evidence was presented did not satisfy his trial counsel's duty of reasonable representation when other significant mitigating evidence was ignored, or left undiscovered. Moreover, petitioner continues, he suffered prejudice as a result under *State v. Davis*, 336 Or 19, 34, 77 P3d 1111 (2003), because the omitted evidence was "qualitatively different" from the evidence presented to the jury. We turn to the specific instances of omitted evidence cited by petitioner.

1. *Evidence that Petitioner had Been Molested by his Mother*

At his post-conviction relief hearing, petitioner argued that his trial counsel had been ineffective for failing to investigate and present evidence of his past traumatic sexual experiences. In particular, petitioner asserted that his mother had sexually abused him when he was a child and later, while he was undergoing residential alcohol treatment

as an adolescent, threatened to harm him if he disclosed that abuse. According to petitioner, information about his sexual abuse had been available to counsel as they prepared for the 1992 penalty-phase retrial and that counsel's failure to investigate, develop, and use that evidence as part of the mitigation case was unreasonable.

The post-conviction court, however, rejected those arguments. It found, among other things, that trial counsel had

"constructed a reasonable theory of mitigation based on petitioner's history of childhood abuse and Dr. Walker's undisputed expertise in the area of post-traumatic stress disorder, after a thorough investigation of petitioner's family history."

The Court of Appeals agreed, holding that

"[t]he record is clear that, at the time counsel were preparing their case, there were few clues as to petitioner's childhood sexual abuse, and those clues were vague. The record supports the post-conviction court's finding that counsel 'provided Dr. Walker with all available and reliable information about petitioner's mental health and family history.'"

*Montez v. Czerniak*, 237 Or App 276, 290, 239 P3d 1023 (2010).

On review, petitioner now argues that materials in trial counsel's possession prior to petitioner's 1992 penalty-phase retrial contained the following "leads or red flags" suggesting that petitioner's mother had sexually abused him as a child:

- Chart notes from the drug and alcohol treatment program petitioner attended as a teenager in which staff members recorded petitioner's disclosures that his mother had "been sexually abusing him since he was a child."

- Petitioner's recorded confession to police detectives in which he asserted that his mother had lost custody of her children in part because of "me and my other brother's sexual abuse."

- A statement from petitioner's mother-in-law in which she indicated that she thought petitioner had been sexually abused as a child.

In depositions taken for petitioner's post-conviction hearing, both defense counsel acknowledged that they had been aware of that information, but had not followed up or developed it, a fact they characterized as "something that was missed." Petitioner, for his part, concedes that he did not disclose any instances of sexual abuse to Dr. Walker during their sessions together. He nevertheless argues that, under the Supreme Court's decision in *Wiggins v. Smith*, 539 US 510, 123 S Ct 2527, 156 L Ed 2d 471 (2003), evidence that a capital defendant was sexually abused as a child is the type of mitigation evidence that counsel has a duty to investigate and present to a penalty-phase jury.

Petitioner, however, misapprehends *Wiggins*'s scope and its applicability to the facts of this case. Contrary to the inference that petitioner would have us draw, the decision in *Wiggins* did not turn on an isolated failure to present evidence concerning a defendant's sexual abuse as one part of a comprehensive mitigation case. It turned, rather, on the fact the defendant's trial counsel had "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. The result was a mitigation case in which the only factor of note presented to the jury was the defendant's lack of a prior criminal record. *Id.* at 537. What the trial counsel in *Wiggins* had failed to discover or present to the jury were the extensive and well-documented details of a troubled life history so marked by unrelenting hardship and abuse that the Court described it as "excruciating." *Id.*[4]

---

[4] According to the Court, the mitigating evidence that trial counsel had not discovered and presented in *Wiggins* was powerful. *Wiggins*, 539 US at 534. Summarizing a licensed social worker's report, the Court wrote that

"Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability."

*Id.* at 535.

*Wiggins*, in short, does not create a *per se* rule requiring evidence of sexual abuse to be made part of a defendant's mitigation case. Rather, that case stands for the unremarkable proposition that a narrowly conceived and executed investigation will always be inadequate when it fails to uncover the depth and breadth of mitigating evidence that was otherwise readily at hand.

That, however, is not the situation here. As set out above, the extensive mitigation case prepared and presented by defense counsel in this matter—focusing, as it did, on petitioner's extremely difficult childhood and his well-documented PTSD, substance abuse, and related problems—could hardly have been more different than that presented in *Wiggins*. Petitioner's claim, however, is that the failure to develop and present *additional* evidence of childhood trauma—the possible sexual abuse of petitioner by his mother—demonstrated that counsel had acted unreasonably. That is simply not the case. As noted, counsel turned over to Dr. Walker all the available and reliable evidence about petitioner's mental health and his family, including the available notes and information regarding sexual abuse. Dr. Walker conducted various psychological tests and personally interviewed and evaluated petitioner over two days in preparation for testifying about his PTSD and related topics. As noted, petitioner admitted at his deposition that, during his interviews with Dr. Walker, he did not disclose the alleged sexual abuse by his mother that he now argues should have been part of the mitigation case.

Petitioner has the burden of proving the facts alleged in the post-conviction petition, ORS 138.620(2), which, as applied here, means demonstrating, by a preponderance of the evidence, that his counsel "failed to exercise reasonable professional skill and judgment." *Burdge v. Palmateer*, 338 Or 490, 492, 112 P3d 320 (2005) (internal quotations and citation omitted); *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991) (same). Here, counsel retained and worked with multiple experts with different specialties to present a detailed mitigation case, including extensive evidence of petitioner's traumatic childhood. Counsel provided the documentary evidence in their possession to retained experts, documents that included references to alleged sexual abuse

by petitioner's mother, and they arranged for the experts to personally interview and evaluate petitioner.

Nothing in the record suggests that petitioner's counsel acted unreasonably in relying on the experts to present the experts' assessment of petitioner's abusive childhood and its impact on his later conduct and personality. In this, as in virtually every complex post-conviction matter, there is always *other* evidence that could have been investigated or introduced. The standard, however, is not whether counsel investigated or introduced every shred of evidence regarding petitioner's background, psychological makeup, or other factors that the jury might possibly have found to be mitigating; rather, the standard under Oregon law is whether petitioner proved by a preponderance of the evidence that his defense counsel failed to exercise reasonable professional skill and judgment. *Burdge*, 338 Or at 492. The record supports the post-conviction court's conclusion that petitioner did not make that showing with respect to counsel's alleged failure to inform the retained experts of evidence available to them in the record that suggested that petitioner had been sexually abused by his mother.

As noted earlier, petitioner does not argue that the Sixth Amendment standard regarding the alleged ineffectiveness of counsel differs from the Oregon standard that we have discussed. Under that standard, a petitioner must show that counsel's conduct fell outside "the wide range of reasonable professional assistance[.]" *Strickland*, 466 Or at 689. For the reasons discussed above, the post-conviction did not err in concluding that petitioner had failed to prove that his counsels' conduct fell outside that range.

2. *Evidence of Petitioner's Brain Injuries and Neurological Issues*

During his post-conviction hearing, petitioner asserted that his trial counsel had unreasonably failed to investigate, prepare, and present evidence regarding petitioner's neurological history, a history that, according to petitioner, included multiple head traumas, a seizure disorder, and organic brain impairment. Petitioner also claimed that, because his counsel had been unaware of that history, they had failed to provide that information to the experts

they had retained. As a result, he asserted, the tests conducted by the experts in preparation for the penalty-phase retrial were insufficiently comprehensive to ascertain the brain damage that he allegedly suffered from at the time of his crimes. In support of that claim, petitioner submitted evidence from three additional neurological experts suggesting that petitioner possessed some degree of trauma or drug-related brain damage when he murdered the victim. The upshot of that condition, the experts opined, was a tendency toward episodic rages or acts of aggression—often in response to minor provocations—over which petitioner had no control.

The post-conviction court rejected those claims. It made factual findings that petitioner's counsel had adequately investigated the possibility of brain damage and other psychological factors in building their mitigation case. It also found that the experts who examined petitioner in preparation for his 1992 retrial had been unable to detect any evidence of organic brain damage in petitioner.

On appeal, petitioner contended that an examination of the records and witnesses otherwise available to counsel would have revealed petitioner's seizure disorder and an extensive history of head injury that signaled potential brain damage. Given that information, petitioner argued, his defense counsel should have obtained a complete and comprehensive neuropsychological evaluation of petitioner. The Court of Appeals, however, disagreed, holding that

> "the issue on appeal in this post-conviction proceeding is not whether petitioner actually had suffered brain damage or even whether he introduced evidence of brain damage in the post-conviction court. Rather, it is whether the post-conviction court's findings are supported by the record and whether those findings support the court's conclusion that counsel were not deficient in their performance. Here, counsel investigated the possibility that petitioner suffered from brain damage, and they employed experts to determine whether that was the case. Petitioner did not prove that counsel failed to exercise reasonable professional skill in their treatment of the possibility of brain damage."

*Montez,* 237 Or App at 304.

On review, petitioner focuses on a narrower aspect of the neurological/organic brain damage issue. He contends that, had trial counsel properly investigated and informed their experts of petitioner's neurological history, those experts would have conducted more extensive tests and determined that petitioner suffered from brain damage or a neuropsychological condition that would have, in turn, provided additional mitigation evidence for petitioner.[5] He argues that trial counsel provided inadequate assistance of counsel by failing to supply the defense's neurological experts with that neurological history. According to petitioner, available records contained information suggesting that he may have sustained organic brain damage at some point in his life. In support of that proposition, petitioner relies, in particular, on the Supreme Court's decision in *Rompilla v. Beard*, 545 US 374.

As with *Wiggins*, however, petitioner's reliance on *Rompilla* fails to focus on the applicable post-conviction standard—*i.e.*, whether counsel failed to exercise reasonable professional skill and judgment—and instead seeks to bring petitioner within the scope of a case-specific decision of the Supreme Court—a decision that instead illustrates the thoroughness and reasonableness of his own counsel's work. The defendant in *Rompilla* had been found guilty of murder by torture and was sentenced to death. His counsel had consulted family members and several mental health professionals in developing a mitigation case. Based on counsel's limited investigation, that case had consisted solely of pleas for mercy by five of the defendant's family members. In his post-conviction proceeding, however, the defendant showed that, if his trial counsel had examined the defendant's readily available criminal records, they would have discovered a range of mitigation leads that included evidence of the defendant's intensely abusive childhood, schizophrenia,

---

[5] Of course, to prevail in his post-conviction proceeding, petitioner also would have to show that the use of this additional mitigation evidence would "have a tendency to affect the result." *Stevens v. State of Oregon*, 322 Or 101, 110 n 5, 902 P2d 1137 (1995); *see also Strickland*, 466 US at 694 (to prove prejudice for Sixth Amendment purposes, petitioner "must show *** a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). Because we conclude that trial counsel was not inadequate or unreasonable, we do not reach the "prejudice" question.

alcoholism, and school records that placed the his IQ in the mentally retarded range. 545 US at 392-93. Had counsel followed those leads, the Court opined, they likely would have found evidence, as post-conviction counsel later did, of organic brain damage that impaired defendant's cognitive functions and his capacity to appreciate the criminality of his conduct. *Id.*

Again, the mitigation case here was completely different. In contrast to the lawyers in *Rompilla,* petitioner's defense counsel engaged in a prodigious effort to formulate and execute a comprehensive mitigation strategy by conducting detailed investigations into all aspects of petitioner's life. Among those investigations were multiple assessments conducted by mental health experts intent on discovering any evidence suggesting that petitioner might suffer from some form of organic brain disease or damage. As discussed above, Dr. Walker, the clinical psychologist retained by trial counsel, recommended that petitioner be examined by a neuropsychologist to determine whether petitioner suffered from any kind of neurological or organic brain disorder that might provide useful mitigation evidence. Trial counsel consulted two neuropsychologists, Dr. Appell and Dr. Goldmann, arranged for a battery of tests designed to identify neuropsychological problems, and set up interviews. Dr. Goldmann examined petitioner over two days, administered various tests that were "particularly sensitive to deficits seen in brain-injured individuals," and questioned petitioner at length. Dr. Goldmann stated that, as part of his regular professional practice, he would have asked petitioner about "any history of head injury and substance abuse," as well as about "symptoms such as headaches, visual disturbances, and attentional problems." Trial counsel provided Dr. Goldmann with various documents in their possession regarding petitioner's history and with information prepared by Dr. Walker regarding petitioner's seizures and other medical problems. Dr. Goldmann stated that his tests showed defendant's results to be "within the normal range" and to reveal "no evidence of brain injury." Another psychologist, Dr. Jacobsen, who examined petitioner prior to the penalty-phase proceeding, similarly stated that petitioner was not "mentally retarded" and that there was no

evidence that a high fever petitioner had suffered as a child had caused any brain damage. The other neuropsychologist that trial counsel consulted, Dr. Appell, concluded that a neuropsychological evaluation was unnecessary. Additionally, a medical doctor evaluated petitioner for signs of brain damage and found none.

The record here demonstrates that counsel actively investigated the potential for putting on mitigation-related evidence that petitioner suffered from organic brain damage or some other neuropsychological condition. Counsel consulted with and retained experts in the field. Those experts, in turn, conducted evaluations and tests that they determined were appropriate. Counsel provided the experts with documents concerning petitioner that counsel had obtained in their investigation, along with information Dr. Walker had developed in her interviews with petitioner. It may be true, as petitioner now argues, that counsel did not themselves provide the neurological experts with some of the extensive background information that they or their investigator had developed, or specific information about his life history. However, nothing in the record suggests that Dr. Goldmann or Dr. Appell did not have access to similar information, or that they requested additional information from trial counsel that trial counsel failed to provide. Rather, those experts apparently felt that they had sufficient information from data provided to them by counsel, as well as interviews and other tests results obtained from petitioner. Moreover, nothing in the record demonstrates that having any of the allegedly missing information before them would have changed the opinions that those experts reached regarding petitioner's brain damage.

For those reasons, we conclude that petitioner failed to show that counsel acted unreasonably in not providing additional information to the experts they consulted, or in their general handling of petitioner's neurological and brain damage issues. Petitioner's counsel acted reasonably in relying upon qualified experts to assist in determining whether, in conjunction with showing petitioner's longstanding and severe psychological problems, they also could argue that he suffered from organic brain damage. Those experts

concluded that there was no evidence to that effect. Under both the Oregon and federal constitutional standards for assistance of counsel, discussed above, the post-conviction court did not err in concluding that petitioner failed to prove that his lawyers had not exercised reasonable skill and judgment in their handling of that issue. The Court of Appeals correctly affirmed the trial court's holding.

3. *Evidence of Petitioner's Request for a Mitigation Specialist*

As we have already noted, petitioner's lawyers sought the trial court's authorization—without success—to add a "mitigation expert" to their defense team. In his petition for post-conviction relief, petitioner alleged that his lawyers were ineffective because they had "failed to make a record objecting to the trial court's refusal to grant petitioner's motion for appointment of a mitigation expert and showing the prejudice to petitioner caused by the trial court's action." The post-conviction court, however, found that

- Trial counsel had, as a matter of fact, moved for appointment of a mitigation specialist.

- Petitioner had failed to prove that counsel had acted unreasonably in not making more of a record concerning denial of that motion.

- Petitioner had failed to prove that the trial court should have or would have granted that motion, had it been provided with additional facts.

The Court of Appeals subsequently affirmed those findings, relying primarily on the following colloquy between trial counsel and the trial court judge, an exchange that took place some time after petitioner's initial request for a mitigation specialist had been denied:

"[TRIAL COUNSEL]: * * * I had submitted a request for a different type of investigation services through this court, and I'm gingerly stepping around this, but I submitted additional affidavits to the court after the court rendered its decision. Have those affidavits changed [the court's mind?]

"[TRIAL COURT]: Everything that has been requested, denied, is filed.

"[TRIAL COUNSEL]: The court has not changed its mind given the new affidavits?

"[TRIAL COURT]: Right."

*Montez,* 237 Or App at 286-87.

Based on that evidence, the Court of Appeals concluded that (1) counsel had, in fact, made an adequate record supporting appointment of a mitigation specialist; and (2) petitioner had failed to carry his burden of proving that counsel performed deficiently in that regard.

On review, petitioner again asserts that a mitigation expert was critical to his defense because the expertise in question involves the ability to: identify mitigation issues from a defendant's social history, document that history, evaluate background materials, identify and locate witnesses, and provide general support to the defendant and the defendant's family. Citing the Supreme Court's decision in *Ake v. Oklahoma,* 470 US 68, 105 S Ct 1087, 84 L Ed 2d 53 (1985), petitioner argues that a defendant in a capital case has a "due-process right to appointment of an expert whose services are necessary to prevent an adequate defense."[6] Consequently, he argues that his trial counsel provided inadequate assistance of counsel by (1) failing to demonstrate that a "mitigation expert" was, in fact, a vital component of an adequate defense in his case, and (2) failing to ask for a hearing or otherwise demonstrate on the record the importance of his request for such an expert.

Here, none of the parties dispute the fact that petitioner's bid for a "mitigation expert" was made—and denied—or that the issue was adequately preserved in the

---

[6] Petitioner does not argue that due process requires courts always to grant a defendant's request to appoint a "mitigation expert" and we are not aware of any case that so holds. In *Ake v. Oklahoma,* 470 US 68, 105 S Ct 1087, 84 L Ed 2d 53 (1985), the Court held that a mentally-ill capital defendant was entitled to a court-appointed psychiatrist to aid him in presenting an insanity defense, because the testimony of such an expert is often "a virtual necessity if any insanity plea is to have any chance of success." *Id.* at 81. Petitioner did not make such a showing here, and, as discussed in the text, did not show that defense counsel failed to demonstrate reasonable skill and judgment in presenting the mitigation case that they did.

post-conviction proceedings below for purposes of this court's review. Instead, petitioner's primary concern appears to focus on the fact that, from a due process perspective, a sufficiently detailed record was not made at trial concerning the underlying rationale for the request. That is, petitioner does not appear to argue that he had a constitutional right to have a "mitigation expert" appointed below, but rather that he has a constitutional right to the basic tools necessary to prepare an adequate defense—and that his trial counsel's failure to detail sufficiently the necessity for a mitigation expert in this case itself raises due process problems.

Even if we accept petitioner's assertions that (1) a mitigation expert could have played a useful role in working with defense counsel in the penalty-phase retrial, and (2) defense counsel could have made a more detailed showing to the trial court regarding the value of such assistance, petitioner's claim is nevertheless unavailing: he has not shown that defense counsel failed to exercise reasonable professional skill and judgment in presenting the mitigation evidence that they did. As discussed above, defense counsel set out a lengthy and robust mitigation case that they developed with the assistance of multiple mental health professionals, petitioner and his family members, former counselors, foster parents, an investigator who traveled to petitioner's childhood home in Minnesota to do additional research, and prison inmates and administrative staff. The resulting mitigation arguments covered a wide range of topics, from petitioner's childhood abuse and deprivation to his psychological profile, his drug and alcohol abuse, and his efforts to control his behavior. Because petitioner did not prove that his defense counsel—aided by experts, an investigator, and petitioner's friends and family—failed to exercise reasonable skill and judgment in developing and presenting a mitigation case, the trial court did not err in rejecting his claim of inadequate assistance of counsel with regard to a mitigation expert.

### 4. *Additional Mitigating Evidence*

Finally, petitioner argues on review that trial counsel provided inadequate assistance of counsel by failing to investigate and present a long list of other kinds of evidence

that the jury should have been able to consider. According to petitioner, that evidence included specific examples of petitioner's personal history of substance abuse and mental illness; his family's history of substance abuse and mental illness; his cultural background; his abusive marriage; his alcohol consumption on the night of the murder; and positive evidence concerning his character.

Petitioner may be correct that the specific examples or facts cited in his brief were not individually investigated and presented to the jury as part of his mitigation case. However, the broad themes represented by that evidence—petitioner's struggles with drugs and alcohol, his dysfunctional family relationships, and a lifetime of abuse—were all presented, albeit in different forms and with some different details. Taken all together, that evidence provided a foundation for the expert opinion that petitioner was, at the time of his crimes, unable to differentiate between his actions and the childhood traumas that he was mentally reliving. Again, the issue is not whether the evidence could have been presented in a different way, or whether additional facts could have been included, or facts that were included omitted. Under our cases, the applicable standard is whether trial counsel exercised reasonable skill and judgment. In assessing the reasonableness of counsel's actions under the Oregon Constitution, we "must make every effort to evaluate [the] lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau,* 333 Or at 360. The fact that petitioner would, in retrospect, have implemented his mitigation defense in one or more different ways is not a ground for post-conviction relief if counsel acted reasonably in presenting the defense that they did. That is the case here.

The federal standard is similar. There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way." *Strickland,* 466 US at 689. Petitioner's defense team was entitled to formulate the mitigation strategy that was reasonable at the time of its conception. *See Richter,* 562 US at 106-07, 131 S Ct at 789 (articulating applicable test). Although petitioner's post-conviction counsel identified numerous details that could have been

handled differently, emphasized or de-emphasized, included or excluded during his penalty-phase retrial, those details do not demonstrate that defense counsel failed to exercise reasonable skill and judgment in their representation of petitioner. The trial court did not err in so concluding, and the Court of Appeals correctly affirmed.

B. *Claims Concerning Disclosure of Petitioner's Previous Death Sentence*

The record makes clear that, at the beginning of petitioner's penalty-phase retrial, petitioner's defense counsel were reticent about allowing the jury to learn that petitioner previously had been sentenced to death. After consulting with petitioner, however, trial counsel nevertheless decided to disclose that information and sought a limiting instruction from the trial court:

> "Your Honor, I think the defense team with a great deal of reservation feels that it is necessary at this point for the jury also to be informed [petitioner] was sentenced to death by the first jury, but in some fashion told that they are not to consider that as part of their deliberation, because the evidence presented may or may not be the same as what was presented then.
>
> "* * * * *
>
> "We're asking for that instruction simply because it will become very clear that [petitioner] was on death row as we go through the rest of this trial."

(Brackets in original.) Although the trial court attempted to persuade defense counsel to substitute a label such as "administrative segregation" for the term "death row," counsel nevertheless chose the latter, reasoning that

> "it is our understanding that the state intends to bring in acts allegedly or committed by [petitioner] while in the penitentiary system, part of that time while he was on death row, and the defense needs to and will offer some sort of explanation for that activity in that specific area of the penitentiary."

*Id.* (brackets in original). To do otherwise, defense counsel continued, "just raises more questions by having it left unsaid," and further indicated that "it is the desires [*sic*]

of [petitioner] that the jury be told about the prior death sentence." *Id.* Petitioner twice confirmed that those were, indeed, his wishes, once in an informal exchange with the trial court, and again—at the prosecutor's request—by executing a formal waiver of any objection to the mention of his prior death sentence. As a result, the trial court gave the following explanation and limiting instruction to the jury:

> "Before we proceed to the next witness, I want to explain something to you in an effort to remove the mystery or any speculation from this matter: As you're all now probably aware, [petitioner] was convicted of Aggravated Murder, as we've discussed here, by a jury after a trial in 1988. A death sentence was imposed. An appeal was taken, as required by law, and a new sentencing hearing was ordered. You've been impaneled to decide the sentence.
>
> "Now as to your role as the trier of facts, this is a new proceeding, and you will decide the weight to be given the evidence presented here, which may be different than the evidence presented before.
>
> *"Now, what happened previously, with the exception of the guilty finding, is not a consideration in this case. I tell you this because I don't want you wondering, and I don't want you speculating, and I don't want you to misuse the information before you."*

(Emphasis added.)

In seeking post-conviction relief below, petitioner asserted that trial counsel had unreasonably "introduced evidence that petitioner previously had been sentenced to death and had been on death row and advised petitioner to waive any objections to the introduction of such evidence." The post-conviction court rejected that claim, finding, among other things, that petitioner had wanted his 1992 jury to learn that he had been on death row and had fared well with the other inmates there and in the general population.

The Court of Appeals held that the post-conviction court did not err in so finding. In reaching that conclusion, the Court of Appeals noted that

> "counsel reasonably could have believed that it would benefit petitioner if the jury knew not only that another jury

had sentenced him to death, but that the death sentence had been determined by a court to be improper. Moreover, a jury could believe that a death row inmate might have nothing to gain from pretending, such that his exemplary behavior is more likely to be heartfelt than is the case with other inmates."

*Montez,* 237 Or App at 304.

On review, petitioner focuses on that excerpt from the Court of Appeals' opinion. He argues that under both Article I, section 11, of the Oregon Constitution and the Sixth Amendment, the Court of Appeals was precluded from focusing on strategies that defense counsel *could* reasonably have had in mind in deciding to reveal petitioner's prior death sentence.[7] Instead, petitioner asserts that Oregon courts must focus on counsel's actual strategic reasoning. To do anything less, petitioner continues, is simply a *"post hoc* rationalization of counsel's conduct, rather than an accurate description of their deliberations."

Petitioner's argument is not well-taken. As set out above, defense counsel discussed with the trial court the strategic reasons for disclosing petitioner's previous death sentence, and petitioner himself agreed with their reasoning. Other lawyers might disagree with that strategic choice, but the choice itself was made with appropriate consideration of the risks and benefits, and we cannot say that it was unreasonable.

We agree, of course, that courts may not indulge in *post hoc* rationalizations of trial counsel's decisions that contradict the evidence derived from their actions, *Richter,* 562 US at 109, 131 S Ct at 790. That evidence, taken from the record as a whole, may demonstrate the absence of strategic thought or direction on the part of a defense team. For example, in *Wiggins v. Smith,* discussed above, the Supreme Court concluded that the sentencing record underscored the unreasonableness of the counsel's conduct because it

---

[7] Petitioner does not distinguish between the standards that apply to this argument under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution; consequently, we discuss his state and federal constitutional arguments together.

tended to show "that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." 539 US at 526. In *Stevens v. State of Oregon*, 322 Or 101, 109-10, 902 P2d 1137 (1995), this court engaged in a similar assessment when it concluded that a lawyer's decision not to interview potential witnesses at a school had not been a strategic choice, but rather one driven by the lawyer's decision to simply rely on police reports to identify and develop a roster of material witnesses.

In both *Wiggins* and *Stevens,* the record revealed the absence of strategically-based action; that, however, is not the case in this matter. Here, even as articulated by petitioner, the record amply supports the conclusion that defense counsel reasonably believed that revealing petitioner's prior death sentence would inure to his benefit. Petitioner sought to present a human face to jurors by emphasizing the stressful environment of death row and the strides he had made while incarcerated there. That strategy would have been difficult to implement without establishing the predicate fact of his prior death sentence. Moreover, as noted, the trial court took pains to confirm that petitioner himself agreed with the decision to disclose his prior death sentence and had executed a written waiver of any objection to references regarding that sentence. We cannot say that the post-conviction court erred in concluding that petitioner had failed to prove that his lawyers provided inadequate assistance of counsel by revealing petitioner's prior death sentence to the jury.

## C. *Claims Concerning Defense Counsels' Use of Inmate Witnesses*

During opening arguments at petitioner's penalty-phase retrial, the prosecutor had asserted that petitioner remained dangerous even while in prison. In support of that statement, the prosecutor went on to present evidence of numerous fights that petitioner had with other inmates while incarcerated—at least one with another death row inmate. The reason for that evidence, the prosecutor had explained in his opening remarks, was to provide a foundation from which the jury could, in part, evaluate the likelihood of petitioner's future dangerousness, a factor that the

jury was required to consider in deciding whether or not to sentence petitioner to death.[8]

The record demonstrates that petitioner and his defense counsel together developed their own responsive strategy to address the state's evidence, a strategy that was built around the testimony of particular inmates with whom petitioner had been incarcerated. As the post-conviction deposition given by one of petitioner's defense counsel made clear:

> "It's my recollection—whether it's right or wrong—that [petitioner] very much wanted the jury to learn what the [prison] environment was like. [He wanted the jury to be] introduced to some of the other long-term guests there, and be told of the type of situation it was there."

The evidence, in short, showed that petitioner wanted the jury to learn about the death row environment in which he lived by hearing testimony from a select group of inmates that he personally had chosen. The goal, petitioner himself acknowledged, was to expose the jury to evidence that his behavior had improved while in prison, and to highlight some of his positive personal attributes. When asked whether she had tried to dissuade petitioner from that particular course of action, defense counsel indicated that "I don't think I tried to dissuade him. I think I did tell him I didn't like the idea." At the same time, however, she conceded that there was "some advantage" in exposing a jury to individuals who had done similar things as defendant, but had not been sentenced to death.

To that end, the jury was transported to the Oregon State Penitentiary to hear testimony from the inmates assembled by petitioner,[9] all of whom had been incarcerated with petitioner in various special housing units within the prison, either death row, administrative segregation, or disciplinary segregation. Defense counsel had gathered a diverse mix of prisoners to serve as character witnesses

---

[8] See ORS 163.150(1)(b)(B) (requiring jury to determine "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

[9] Eight inmates testified for petitioner and all did so at the penitentiary except for Kenneth McPhail, whose testimony was taken at the Multnomah County Circuit Court.

for petitioner: other death row residents; inmates who, like petitioner, had Native American ancestry; and inmates who had been participants in, or witnessed, fights in which petitioner had been involved. Counsel would later testify that she knew beforehand the substance of the testimony the inmates intended to give and their criminal records. She also indicated that petitioner had assured her that he was very familiar with the inmates that he had chosen and knew that they would speak favorably on his behalf.

As it turned out, the inmates' testimony relating to petitioner was, indeed, highly favorable. Essentially, the inmates told the jury that, despite the harsh conditions of death row and the special difficulties facing mixed-race inmates like petitioner, petitioner nevertheless had grown spiritually while incarcerated, learned to remain calm in the face of provocation, and had himself become a peacekeeper of sorts, exerting a calming influence on those around him. Several inmates who had fought with petitioner on different occasions testified that they had initiated the respective confrontations in which they had been involved and that petitioner had either not fought back or had refrained from injuring the other combatant.

The prosecutor, however, also elicited testimony from those inmates. On both direct and cross-examination, some of the inmates confirmed that they were slated for early release on parole, some acknowledged their own multiple escapes and escape attempts while incarcerated, and some described the lengthy appeals that had been, or were being, litigated on their behalf while they remained on death row. Defense counsel objected to some, but not all, of that testimony. When asked during the post-conviction deposition about the limited objections she had made during that testimony, one of petitioner's lawyers testified that

"there's always a weighing that occurs when you're examining or cross-examining or objecting to witnesses, and you have to decide if it's going to make the unwanted statement more important to the jury if you object and bring attention to it or if you don't."

In seeking post-conviction relief, petitioner asserted that his counsel had provided ineffective assistance of counsel by calling

"character witnesses from death row, administrative seg-
regation, and disciplinary segregation, at the Oregon State
Penitentiary without conducting interviews, or meeting
with the witnesses prior to trial and then failing to object
to irrelevant and prejudicial questions about the lengths of
their sentences and scheduled parole release dates or about
escapes and attempted escapes from prison."

The post-conviction court, however, rejected those claims,
finding that it had been petitioner's decision to call his fel-
low inmates as character witnesses, and that the inmates
had been personally selected by petitioner for the purpose of
demonstrating that he was neither dangerous nor violent in
a prison setting.

The Court of Appeals agreed. It wrote:

"Even assuming that counsel's choices regarding use of
the inmate testimony and whether to object to some of it
were not, in hindsight, the best choices, that is not the
test. Even effective counsel may make 'tactical choices
that backfire, because, by their nature, trials often involve
risk. *Krummacher*, 290 Or at 875, 627 P2d 458. The post-
conviction court's findings are supported by evidence in
the record and dispose of petitioner's arguments about the
inmate testimony."

*Montez*, 237 Or App at 307.

On review, petitioner now argues that his trial
counsel was deficient for (1) calling prison inmates as
witnesses, (2) taking their testimony at the prison itself,
(3) failing to adequately prepare for that testimony, and
(4) failing to object to questions concerning the inmates'
sentences and escape attempts. After reviewing those
arguments, however, we conclude that they do not warrant
detailed discussion. Both this court and the Supreme Court,
applying Article I, section 11, and the Sixth Amendment
respectively, have emphasized the many choices counsel
must make in litigation and the difficulty of predicting the
consequences of those choices.[10] *See Krummacher*, 290 Or at
875 (consideration of adequacy of counsel "allows for tactical

---

[10] Again, petitioner does not assert that the applicable state and federal con-
stitutional provisions call for different analysis, and we therefore discuss those
provisions together.

choices that backfire"). Moreover, mitigation evidence, by nature, often is a "two-edged sword" that, with respect to a jury, may be as capable of damaging a case as it is of aiding it. *See, e.g., Atkins v. Virginia*, 536 US 304, 321, 122 S Ct 2242, 153 L Ed 2d 335 (2002) (recognizing that mitigating evidence can be a "two-edged sword" regarding jury assessments of future dangerousness). For that reason, in assessing the adequacy of defense counsel, we focus on the reasonableness of counsel's decisions at the time they were made and whether counsel actively and capably advocated on behalf of the defendant, rather than on whether counsel was successful.

The Supreme Court has observed that "it is difficult to establish ineffective assistance [in a post-conviction proceeding] when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 US at 111, 131 S Ct at 791. In our view, the efforts of defense counsel with respect to the use of inmate witnesses, as set out above, are examples of "active and capable advocacy." The fact that those efforts were ultimately unavailing does not render them constitutionally deficient. Defense counsel cannot be faulted for lacking a crystal ball with which to predict how the jury would react to the mitigation evidence they were presented with. Trials, by nature, frequently involve risk, and a "risk which is foolish in a close case may be sound where the prosecution is strong and the defense weak." *Krummacher*, 290 Or at 875. Given the particularly grim facts surrounding petitioner's aggravated murder conviction, defense counsel's tactical use and treatment of the inmates hand-picked by petitioner to provide evidence of his improved and positive character was not so foolish as to constitute an unsound strategy. The post-conviction court did not err in concluding that petitioner had failed to prove that his lawyers provided inadequate assistance of counsel by having prison inmates picked by petitioner testify on his behalf.

D.   *Claims Concerning Actuarial Evidence Regarding Future Dangerousness*

In addition to the evidence provided by petitioner's fellow inmates at his penalty-phase retrial, petitioner also called other witnesses whose testimony was similarly intended

to counter the state's evidence of petitioner's future danger-ousness. As noted above, one of those witnesses was psychol-ogist Dr. Colistro, an expert in psychological issues related to prisoners. Dr. Colistro discussed Dr. Walker's diagnosis of petitioner's condition, explaining to the jury that, as diag-nosed, petitioner was certainly treatable within the prison system, and that treatment could lessen the risk of peti-tioner's future dangerousness. He further testified that an antisocial personality disorder such as petitioner's was not a significant clinical factor in assessing an inmate's risk for violence, and that the risk level, in any event, decreased with age. Finally, Dr. Colistro told the jury that it was significant when an individual's assaultive behavior decreased—as petitioner's had—once confined in a secure setting.

Defense counsel also presented testimony from assistant prison superintendent Armenakis and from Hande, prison supervisor for the Cell Study Projects, a program that aided inmates in furthering their education. Armenakis described how petitioner had obtained early release from the Disciplinary Segregation Unit—a sanction that had been imposed for fighting with another inmate—in part because of his adjustment and positive attitude. Hande testified regarding petitioner's efforts to take advantage of educational opportunities offered within the prison.

In the course of seeking post-conviction relief, however, petitioner argued that his lawyers had failed to investigate and present additional evidence that could have rebutted the state's evidence of petitioner's future danger-ousness. Those omissions, petitioner continued, had preju-diced his mitigation case. Among them, petitioner argued, was counsel's failure to investigate and present evidence of actuarial studies showing that capital offenders gener-ally presented a low risk for violent action in prison and on old-age parole. As noted, defense counsel did present expert testimony from psychologists and testimony from prison officials as to the risk of future violence of petitioner himself and of different groups, such as defendants who are incarcerated, have particular mental illnesses, or are in certain age categories. Petitioner's argument, advanced in the post-conviction proceeding by forensic psychologist

Dr. Cunningham, was that defense counsel was inadequate in failing also to introduce *actuarial* evidence of the risk of future dangerousness posed by different groups in prison.

Dr. Cunningham's 130-page affidavit contained multiple observations regarding the efficacy of the 1992 mitigation case that counsel had mounted on petitioner's behalf, among them a critique of the failure of trial counsel and trial counsels' experts to use actuarial data to assess petitioner's future dangerousness. In his affidavit, Dr. Cunningham stated that he had first begun providing expert testimony on future dangerousness utilizing a statistics-driven actuarial methodology in 1995. His affidavit also showed that, in 1998, he had published a paper in which he prepared actuarial analyses from the raw data that he had gathered; his stated purpose in doing so was to make assessments concerning the future dangerousness of capital inmates more empirically driven. In the article described in his affidavit, which provided the basis for his expert opinion, Cunningham stated:

> "Actuarial follow-up data on the violent recidivism outcome of capital murderers in prison and post-release has been compiled and synthesized in this paper with the hope that capital sentencing risk assessment testimony will be more empirically based and thus will more closely reflect the probabilities demonstrated by this group of offenders."

M. D. Cunningham and T. J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 Behavioral Sciences & the Law 71, 92 (1998).

As noted, defense counsel had presented evidence through the expert testimony of Dr. Colistro that the risk of future dangerousness declines with age and that the programs available to petitioner in prison also could reduce that risk. Dr. Cunningham's affidavit, however, criticized the lack of actuarial data employed by defense counsel in presenting their case on petitioner's future dangerousness. Predictions regarding an inmate's risk of future violence while incarcerated, Dr. Cunningham maintained, were most reliable when based on actuarial data; such data, he continued, could have been presented at petitioner's 1992 sentencing retrial:

"Important perspectives regarding [petitioner's] risk of violence in prison could have been presented at his capital sentencing trial. Specifically, risk assessment of the probability of future violence is most reliably based on actuarial data which is then conservatively individualized to the particular defendant. Actuarial data indicates that capital offenders as a class have a low rate of institutional violence. Individualizing this base rate to [petitioner] indicates that his likelihood of serious violence in prison would be below the base rate of violence in capital offenders. It is anticipated that this risk would further decline as [petitioner] ages across a capital life term. Should he be identified as a disproportionate risk of institutional violence, segregation mechanisms including IMU confinement existed in the Oregon Department of Corrections to substantially negate any opportunity he would have to perpetrate violence in prison. This information could have been of mitigating significance in assisting the jury to come to a more accurate understanding of his low likelihood of violence in prison. This data was also of critical significance in rebutting State's indirect allegation of his incorrigibility through its emphasis on the heinousness of the offense."

According to Dr. Cunningham, without that kind of statistical data, sentencing juries were likely to be biased toward overestimating an inmate's risk of future violence.

The state responded by presenting an affidavit from its own expert, attorney and forensic psychologist Dr. Hulteng. After reviewing Dr. Cunningham's affidavit, Dr. Hulteng had stated:

"In his affidavit, Dr. Cunningham argues that the 'conceptual and research literature' supporting his position was 'easily available to experts or counsel in 1992.' That is true only in the broadest sense. Certainly, experts should have been aware at that point of concepts such as base rates and false positives. The debate over actuarial vs. clinical prediction was already well underway.

"* * * * *

"[However,] Dr. Cunningham's interpretation of how actuarial principles should be applied in a capital sentencing context * * * was not articulated by him until many years after the petitioner was sentenced."

Dr. Hulteng, in short, disagreed with Dr. Cunningham's view regarding of the availability—in 1992—of completed actuarial studies and established base rates for capital sentencing purposes. Petitioner's trial counsel, moreover, stated in 2001 that there were no experts in 1992 testifying about actuarial studies on future dangerousness.

The post-conviction court rejected petitioner' claims regarding actuarial assessments. It found, among other things, that Dr. Hulteng had presented credible evidence demonstrating that, in 1992, expert testimony describing the existence of actuarial studies that could predict future dangerousness in capital inmates was nonexistent. The Court of Appeals affirmed the trial court's judgment, holding that petitioner's counsel were not ineffective for failing to present actuarial evidence as part of their mitigation case. As that court stated: "Although both petitioner and the state presented additional information on the nature of risk assessment and prediction of future dangerousness—and on the state of the art in 1992—suffice it to say that each side had its expert, and the experts disagreed." *Montez*, 237 Or App at 310.

On review, petitioner does not dispute the post-conviction court's finding that actuarially-based expert testimony on the future dangerousness of capital inmates was unavailable in 1992. Instead, his primary argument at this point is that the research and data *capable* of supporting such testimony existed prior to 1992, and that counsel unreasonably failed to investigate and present evidence of *that* information as part of petitioner's mitigation case.

Petitioner's argument is unavailing. His defense counsel relied upon multiple experts to assist them in presenting evidence of petitioner's lack of future dangerousness. Their evidence included specific clinical assessments of petitioner's risk of future dangerousness, his behavior in prison, and other statistically predictive factors such as his age. Defense counsel worked with the experts and appropriately relied on them to present the best evidence that they believed was accurate and persuasive. Petitioner has not shown that his defense counsel failed to exercise reasonable skill or judgment in retaining and relying upon the experts they selected.

Moreover, although Dr. Cunningham's affidavit indicates that raw "data" was available in 1992 that could have provided a basis for the actuarial studies that he discusses, nothing in the record indicates that experts on dangerousness were using the data in that way in 1992. Indeed, on this record, it appears that the first expert witness to compile and use actuarial evidence of future dangerousness in a capital case was Dr. Cunningham himself in 1995, three years after petitioner's penalty-phase retrial. Furthermore Dr. Cunningham's paper presenting that actuarial data did not appear until 1998.

The trial court did not err in concluding that petitioner failed to prove that his defense counsel did not exercise reasonable skill and judgment in their presentation of evidence regarding his future dangerousness.

E. *Claims Concerning Jury Instructions*

Prior to *voir dire* in petitioner's penalty-phase retrial, the trial court instructed potential jurors on the three statutory questions—previously set out above—that they would be required to answer as part of the sentencing process. Regarding the third question in particular—"Should the defendant receive the death sentence?"—the court expressly told the potential jurors that "you should answer this question no if you find that there is any aspect of the defendant's character or background or any circumstance of the offense that you believe would justify a sentence less than death." The court went on to explain the effect that a "yes" or "no" determination of those statutory questions would have on petitioner's sentence:

"If you find that the state has proven the affirmative of the three questions beyond a reasonable doubt, you answer each question yes. Before any question can be answered yes, all 12 jurors must agree on that answer.

"If you decide that the state has failed to prove the affirmative on any one or more of the questions beyond a reasonable doubt, then you must answer that question no. If all 12 jurors cannot agree that a particular question should be answered yes, then the answer must be no.

"Now, if your answer to all three questions is yes, the law requires that the penalty shall be death. If your answer

to one or more of the questions is no, the law requires that the penalty shall be life imprisonment."

Following closing arguments at the conclusion of petitioner's retrial, the court again instructed the jury on how to address the three questions:

"Now, in determining the issues raised in these questions before you, you may consider any evidence which you consider to be mitigating. This includes, but is not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

"* * * * *

"Now as a reminder, in order to answer yes to any of the questions, 12 of you, all of your number must agree on that answer. If upon any question all of your number, 12 of you cannot agree that the question is should be answered yes, then your answer to that question must be no."

The jury deliberated for over four days, during which time it submitted several written questions to the trial judge. One of the questions posed was, "Do all 12 jurors have to agree on question # 3," a reference to the general mitigation inquiry into whether petitioner should be sentenced to death. The trial judge wrote back, "In order to answer 'yes' to any question, 12 of you must agree on that answer." When the jury returned a verdict of death for petitioner, counsel asked that the jury be polled. The court declined to conduct an oral poll and instead administered a written poll in the jury room.

In seeking post-conviction relief, petitioner argued generally that his trial counsel had unreasonably failed to:

- Educate the jury to the fact that a single "no" vote from among its 12 members was enough to return a verdict of life imprisonment for petitioner.

- Seek an instruction from the trial court to that effect, either at the time that jury instructions were being given, or in response to the jury's written question to the trial court.

- Inform the jury that each of its members was required to give individualized consideration to the mitigating evidence offered by the defense

- Object to denial of the oral jury poll requested by petitioner.

In addition, petitioner asserted that, on the second or third day of jury deliberations, trial counsel had learned, off the record, that the jury had been sent home early because one of the jurors had left the jury room in tears and did not want to continue deliberating. Petitioner argued that, upon learning of that development, trial counsel had unreasonably failed to inquire as to whether a verdict of life imprisonment had been reached and failed to object when the trial court required jury deliberations to continue.

The post-conviction court, however, found that petitioner had generally failed to produce evidence sufficient to prove those allegations. It also found that the trial court had clearly instructed the jury that, if its 12 members could not agree that a question should be answered "yes," then the answer to that question had to be "no." The Court of Appeals agreed, holding that (1) because the trial court's jury instructions had been correct, the decision by petitioner's counsel to devote themselves to other matters had not been unreasonable; (2) because the trial court's answer to the written question proffered by the jury had been legally sound, the decision by petitioner's counsel not to object to it had not been unreasonable; and (3) petitioner had failed to prove that objecting to the written jury poll would have had a tendency to affect the jury's verdict. The Court of Appeals did not address trial counsel's alleged failure to inquire as to whether a life imprisonment verdict had been reached following the unrecorded events that had supposedly caused the jury to be sent home early during its deliberations.

On review, petitioner first contends that trial counsel wrongly failed to ensure that each juror understood his or her individual role in giving effect to mitigating evidence. Specifically, he argues that reasonable counsel would have approached *voir dire*, argument, and jury instructions with the goal of informing jurors of the effect that a single "no" vote would have on petitioner's sentence, while directing

them to give full consideration and effect to the mitigation evidence offered by the defense.

Petitioner's argument is unavailing. Under ORCP 59 B—made applicable to criminal trials pursuant to ORS 136.330—the responsibility for explaining the legal standards rests with the trial court:

> "In charging the jury, the court shall state to the jury all matters of law necessary for its information in giving its verdict."

As set out above—and undisputed here—the trial court correctly instructed the jury regarding the unanimity requirement in answering the three questions. The jury, moreover, operates under an oath that

> "they and each of them will well and truly try the matter in issue between the plaintiff and defendant, and a true verdict give according to the law and evidence as given them on the trial."

ORCP 57 E (made applicable to criminal trials by ORS 136.210(1)). Under Oregon law, we presume that a jury has honored its oath and followed the court's instructions, *State v. Elkins*, 248 Or 322, 327, 432 P2d 794 (1967), unless there is "an overwhelming probability that they would be unable to do so." *State v. Barone*, 329 Or 210, 225, 986 P2d 5 (1999).

Here, there is little probability that the jury was unable to understand and follow the trial court's jury instructions. Those instructions clearly communicated to jury members that they were free to consider any evidence that they viewed as mitigating. The instructions also made clear that if all 12 jurors could not unanimously agree to answer a question in the affirmative, "then your answer to that question must be no."[11] As noted above, we presume that the jury followed those instructions in reaching its sentencing verdict. Consequently, we conclude that the jury was adequately instructed concerning the law governing the three questions that had to be answered in the affirmative for defendant to be sentenced to death, including the mitigation and other evidence that the jury could use in answering

---

[11] Petitioner has not collaterally challenged the jury instructions themselves in these proceedings.

those questions. Viewed in that light, there was neither a duty nor a need for trial counsel to: (1) further inform jurors of the effect that a single "no" vote would have on petitioner's sentence, or (2) direct them to give full consideration and effect to the mitigation evidence offered by the defense. Petitioner's argument reduces to the assertion that defense counsel should have emphasized different aspects of the mitigation case during closing argument. It does not, however, demonstrate that defense counsel acted unreasonably in failing to make the arguments that petitioner identifies.

Petitioner also asserts that trial counsel unreasonably failed to object to the trial court's answer to the jury's mitigation-related question, "Do all 12 jurors have to agree on question # 3?" Petitioner contends that the trial court's response—"In order to answer 'yes' to any question, 12 of you must agree on that answer"—warranted an objection because, although correct, it was incomplete and therefore misleading. According to petitioner, the trial court's answer improperly focused on the jury as a whole, rather than on individual jurors and the power each possessed, standing alone, to prevent a death sentence from issuing. Without that emphasis, petitioner argues, jurors could have interpreted the trial court's answer to mean that they had to reach a unanimous verdict, even for a life sentence.

We disagree. In determining whether a particular instruction—in this case, a clarifying instruction—was erroneous and therefore objectionable, we read the jury instructions as a whole to ascertain whether they together articulate the law accurately. *See State v. Woodman*, 341 Or 105, 118, 138 P3d 1 (2006) (so stating). Although the trial court's response to the jury's query only addressed the unanimity required to answer "yes" to the statutory questions at issue in petitioner's sentencing, the instructions previously provided to the jury clearly set out the prerequisites for both a "yes" and "no" outcome: answering "yes" to any particular question required unanimous agreement among all 12 jurors; absent unanimous agreement, however, that question was required to be answered "no." Those instructions were, and remained, unambiguous; consequently there was no basis for counsel to object to the trial court's clarifying instruction.

Finally, petitioner reiterates his argument that, upon learning of the off-the-record jury room incident that occurred on the second or third day of deliberations, trial counsel unreasonably failed to inquire into the matter. Specifically, petitioner contends that the incident suggested that at least one juror was answering "no" to one of the questions before the jury, a situation that, according to petitioner, amounted to a "red flag" that should have prompted counsel to ask the trial court to inquire whether the jury was deadlocked and to have it re-instructed. The same incident underlies the related argument that trial counsel improperly failed to object to the trial court's refusal to conduct an oral jury poll in open court. Again arguing that distress in the jury room demonstrated a likelihood that at least one juror was favoring a verdict of life imprisonment, petitioner contends that polling the jury in open court would have given the supposedly-dissenting juror enough confidence to tender a "no" answer regarding imposition of a death sentence.

We decline to take up either argument here. To the extent that jury deliberations may have been adjourned early on one particular day, there is no evidence in the record of the trial court proceeding or the post-conviction proceeding as to what that issue was. The scenario advanced by petitioner is purely conjecture as to what might have been in the mind of at least one juror. To speculate, however, "concerning the mental processes of juries is forbidden the courts." *DeMaris v. Whittier*, 280 Or 25, 31, 569 P2d 605 (1977). In the absence of any evidence of misconduct, consideration of what may or may not have occurred in the jury room or what any individual juror's views might have been before the verdict was rendered is beyond the purview of this court. Petitioner failed to prove that his lawyers were unreasonable for not having inquired into the jury's deliberations, or for not having objected to a closed jury poll.[12]

We have considered the issues that petitioner raises on review, and, for the reasons discussed above, conclude

---

[12] Petitioner argues that other aspects of his trial counsel's representation during the penalty-phase retrial were inadequate and prejudicial to him. The trial court rejected those arguments and the Court of Appeals affirmed. We reject those arguments without discussion.

that the trial court did not err in denying petitioner post-conviction relief.

The decision of the Court of Appeals and the judgment of the post-conviction court are affirmed.