Argued and submitted May 20, 2013, affirmed December 31, 2014, petition for review denied May 14, 2015 (357 Or 300)

MATTHEW DWIGHT THOMPSON,
*Petitioner-Appellant,*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
99C15857; A140461

341 P3d 911

Daniel J. Casey argued the cause and filed the briefs for appellant.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Mary H. Williams, Deputy Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Petitioner was convicted of aggravated murder and sentenced to death. He sought post-conviction relief challenging his conviction and sentence on a number of grounds, which the post-conviction court denied. He appeals the resulting judgment, contending that the post-conviction court erred in rejecting his claims that his trial and appellate counsel provided him with constitutionally deficient representation in the guilt and penalty phases of his trial and on appeal. For the reasons explained below, we affirm.

## I. THE UNDERLYING CRIMES

We begin with the facts of the underlying crimes, as taken from the Oregon Supreme Court opinion on direct review of petitioner's conviction and death sentence.

"About 10:30 p.m. on November 18, 1994, Andrew McDonald and his wife, Debra Oyamada, were at the Driftwood Tavern in Portland. Defendant and his companion, Paul Whitcher, entered the tavern and ordered a pitcher of beer. Oyamada was sitting at a video poker machine and McDonald was sitting at the bar. Defendant was wearing a plaid shirt. Defendant and Whitcher approached Oyamada. Defendant asked Oyamada if she was from 'the "samurai family"' or 'from samurai blood.' She responded, 'As a matter of fact, yes, I am.' Defendant continued, but Oyamada said she did not want to talk. Oyamada turned her back to defendant because she thought those were 'weird questions' and that defendant was 'overbearing.' Defendant persisted, saying, 'I need to know about it. I'm a warrior and I want to know about this.' Oyamada replied that she did not want to talk about it. Defendant then sat next to Oyamada. She said, 'You're sitting in someone else's seat.' After that, defendant got up from the seat and started to walk toward the door. As they walked, McDonald approached defendant and Whitcher and said, 'Please leave her alone, she doesn't want to talk about it.' Pat Disciascio, the bartender, became concerned, and he directed defendant and Whitcher to leave the tavern. When defendant and Whitcher did not leave immediately, Disciascio said 'Good night, you guys,' and pointed toward the door. As defendant and Whitcher left the tavern, one of the two men said, 'I feel like killing somebody tonight.' Defendant and Whitcher then stood outside, where defendant said to Whitcher, 'I'm going to go

back in there and kick that guy's ass.' Defendant stated to Whitcher, 'If we do this, you know, we're going to jail.'

"Between five and ten minutes after leaving, defendant ran into the tavern alone, grabbed McDonald from behind, began stabbing him, and dragged him outside. Oyamada tried to pry defendant off of McDonald. Defendant then turned on Oyamada, hitting her in the head, throwing her to the ground, and stabbing her in the head and neck. Bill Jones, another tavern patron, grabbed defendant. Defendant stabbed Jones six times. Defendant then ran away. Ambulances took McDonald, Oyamada, and Jones to the hospital. McDonald died as a result of his wounds.

"Defendant and Whitcher went to defendant's grandmother's home, where defendant lived. Defendant introduced Whitcher to his grandmother, then she went to her room to sleep. About 1:30 a.m. on November 19, 1994, defendant's grandmother awoke and went downstairs because she heard a lot of noise. She saw Whitcher cleaning up broken glass and defendant cleaning grape juice off the rug. She asked Whitcher to leave. Defendant said that he was going to see that Whitcher got home safely, and the two men left the house. When defendant returned shortly, his grandmother was still cleaning grape juice. Defendant said he would clean the grape juice and told his grandmother to go to bed, which she did. Before she fell asleep, she heard the washing machine running.

"About 1:30 a.m. on November 19, 1994, Sally Woolley called 9-1-1 to report that she heard loud, angry, male voices outside her home. Woolley reported that a man was lying face down in the street. Another man, wearing a plaid shirt, was kneeling over him and rolled him partially onto his side. The man in the plaid shirt rummaged through the other man's pockets, then ran away.

"The police arrived. The man on the street was identified as Whitcher. He had been stabbed 16 to 20 times and was dead. One pocket had been turned inside out.

"About 2:00 a.m. on November 19, 1994, the police found defendant walking nearby. He smelled of alcohol and was nervous and evasive. His shoes were untied and, although it was a cold night, he was sockless. One eye was swollen. The police thought that defendant might have witnessed Whitcher's stabbing and questioned him. After denying that he had been in an altercation, defendant stated that

he lived nearby with his grandmother, but gave the police his mother's address. He denied ever having been arrested or being on probation. After a record check indicated that he had been arrested and that currently he was on probation, defendant was taken into custody.

"The police first contacted defendant's mother, who stated that defendant did not live with her. She gave the police defendant's grandmother's address. The police contacted defendant's grandmother at her home. She invited the officers into her home and gave them permission to look around. Defendant's grandmother then led them to the washing machine in the basement and opened the lid. Blood was smeared on the outside of the machine. The washed clothing in the machine had stains consistent with blood. The grandmother told police that the clothing in the machine was defendant's. The state's criminologist concluded that the DNA recovered from the top of the washing machine, and from jeans, a shoelace, and a sock found in the washing machine, was consistent with Whitcher's.

"At 12:30 p.m. on November 19, 1994, detectives returned to defendant's grandmother's home with a search warrant. After finding no weapons, the police left. They returned around 5:00 p.m. that day. With defendant's grandmother's consent, the detectives searched her basement. A detective found a bloody knife on a cross-beam and a blood-smeared wallet inside a wood stove. The knife was consistent with defendant's grandmother's description of a knife defendant owned. The state's criminalist concluded that the blood on the knife and wallet matched Whitcher's blood type."

*State v. Thompson*, 328 Or 248, 250-52, 971 P2d 879, *cert den*, 527 US 1042 (1999).

Petitioner was charged in a 22-count indictment with the murders of McDonald and Whitcher and related crimes. Petitioner pleaded not guilty to all counts and proceeded to a jury trial, in which petitioner was represented by attorneys Lynne Dickison and Jon Martz. The jury ultimately convicted petitioner of four counts of aggravated murder, two counts of murder, two counts of felony murder, one count of first-degree robbery, two counts of first-degree burglary, and two counts of first-degree assault. *Id.* at 252-53. After a penalty-phase proceeding, petitioner was sentenced to death. *Id.* at 253. On automatic and direct review,

the Oregon Supreme Court affirmed petitioner's death sentence, and the United States Supreme Court denied review.

## II. THE POST-CONVICTION CASE AND APPLICABLE LAW

In a petition for post-conviction relief, petitioner alleged 22 claims of ineffective assistance of counsel before and during the guilt and penalty phases of his trial, and on appeal. Following the post-conviction trial, the post-conviction court issued a 60-page letter opinion, as well as an additional 19-page memorandum detailing further findings and conclusions, and rejected each of petitioner's claims. On appeal, petitioner raises 26 assignments of error, many of which contain multiple arguments regarding trial counsel's allegedly deficient performance and the ways in which those deficiencies affected the outcome of petitioner's trial and appeal. We write to discuss only four of petitioner's assignments of error, supplementing our discussion of each with a recitation of the pertinent facts, although we have considered and reject without written discussion the balance of petitioner's assignments.

To prevail in a post-conviction proceeding, a petitioner must establish by a preponderance of the evidence a "substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." ORS 138.530(1)(a). As noted, petitioner alleged in his post-conviction petition that his trial counsel had performed deficiently at the guilt and penalty phases of his criminal trial, and that his appellate counsel had performed deficiently in the subsequent appeal.

Petitioner's claims are grounded in both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, which guarantee a criminal defendant the right to adequate representation by counsel. *Strickland v. Washington*, 466 US 668, 688, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (Sixth Amendment right to counsel requires "effective" assistance by counsel); *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981) (Article I, section 11, requires "adequate performance by

counsel"). In reviewing petitioner's claims, we first consider his arguments under Article I, section 11, proceeding to his arguments under the federal constitution only if necessary. *Lichau v. Baldwin*, 333 Or 350, 358-59, 39 P3d 851 (2002).

We evaluate petitioner's claims of constitutionally deficient assistance of counsel under Article I, section 11, in two steps:

> "First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his lawyer] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial."

*Montez v. Czerniak*, 355 Or 1, 7, 322 P3d 487 (2014) (quoting *Lichau*, 333 Or at 359).

While Oregon courts have construed and applied the requirements of Article I, section 11, independently of the United States Supreme Court's construction and application of the Sixth Amendment, the Oregon Supreme Court has nonetheless recognized that the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to the standards governing the effectiveness of counsel under the federal Constitution. *Montez*, 355 Or at 6-7; *State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008). Under the Sixth Amendment, we first determine whether petitioner has established that his counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 US at 688. If so, we determine whether petitioner has demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In performing our task, we are bound by the post-conviction court's findings of historical fact if there is evidence in the record to support them. *Montez*, 355 Or at 8. In the event that the post-conviction court failed to make a finding, and there is evidence from which facts could be found in more than one way, we presume that the facts were found consistently with the post-conviction court's ultimate legal conclusions. *Id.* Finally, we "make every effort to evaluate a

lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau*, 333 Or at 360; *see also Strickland*, 466 US at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight * * *."). And we will not "second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). As has often been noted,

> "[t]he constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have avoided."

*Krummacher*, 290 Or at 875.

## III.   PETITIONER'S CLAIMS ON APPEAL

With those general principles in mind, we turn to petitioner's claims in this case. On appeal, in 26 assignments of error, petitioner raises numerous challenges to the post-conviction court's ruling on petitioner's claim of inadequate assistance of counsel. We address only those that, in our view, require discussion. Those claims relate to trial counsel's initiation of competency proceedings; their failure to call expert witnesses in support of petitioner's intoxication defense; their failure to argue the federal constitutional underpinnings of a motion for judgment of acquittal; and, finally, their failure to adequately investigate and present mitigation evidence in the penalty phase of petitioner's trial. We discuss each in turn.

A.   *Initiation of competency proceedings*

We first address petitioner's contention that the post-conviction court erred in denying petitioner's claims of inadequate assistance of counsel related to the initiation of competency proceedings. Before addressing the specifics of petitioner's claim, we set out the pertinent factual background in accordance with our standard of review.

As noted, petitioner was arrested in November 1994 for the murders of McDonald and Whitcher. Shortly

thereafter, the court appointed Dickison to represent defendant and scheduled petitioner's trial for July 1995. Dickison hired a defense investigator, Philip Agrue, and the two met with petitioner in December 1994. Difficulties immediately arose between petitioner and his defense team. At their initial meeting, petitioner refused to discuss the murders in detail, and Agrue arranged to return the following week. However, when Agrue contacted petitioner in preparation for their meeting, petitioner again refused to speak with Agrue about the murders. Instead, petitioner told Agrue that he was uncomfortable with Dickison serving as his attorney, because petitioner questioned her record and believed that she was too busy to adequately represent him. Notwithstanding that concern, petitioner told Agrue that he wanted to meet with Dickison and discuss his case without Agrue present. Petitioner subsequently told Dickison that he did not trust Agrue and that he wanted Dickison to employ another investigator. Dickison complied and hired a second investigator, Shirley Beers, to replace Agrue; a second attorney, Martz, was also appointed to assist Dickison.

Matters did not improve, and, by February 1995, petitioner had proposed a motion to withdraw, as well as an accompanying affidavit, that he forwarded to Dickison. The motion and affidavit were accompanied by a letter in which petitioner instructed Dickison to execute and file the motion; petitioner also told Dickison that he was both filing a civil action against her and submitting a complaint to the Oregon State Bar. In early March 1995, petitioner refused to meet with his defense team, and the defense filed a motion for substitution of counsel a few days later. On March 14, 1995, the court held a hearing on the substitution motion. At the hearing, Dickison recounted the difficulties that had arisen between petitioner and his defense team but told the court that she did not believe that "the communications ha[d] deteriorated to the point where [the defense team] cannot represent [petitioner]." After a lengthy colloquy, the trial court denied petitioner's motion.

Over the same time span, as petitioner refused to cooperate with his defense team, Dickison became concerned that petitioner was unable to aid and assist in his defense. As a result, in late February 1995, Dickison hired

a psychiatrist, Dr. Norman Janzer, to evaluate petitioner. Between February and May 1995, Janzer met with petitioner a number of times, interviewing him for "more than six hours" and administering the Minnesota Multiphasic Personality Inventory (MMPI) psychological assessment test. Janzer summarized the results of his evaluation in a letter to Dickison on May 16, 1995, reaching the following conclusion:

> "Based on the time I spent with [petitioner] and the somewhat usable MMPI test, I believe his long-standing psychopathology prevents him from emotionally appreciating his legal situation and from assisting his attorney in preparing his legal defense. I believe this would likely be the experience of any attorney now trying to help him. His paranoid ideation is mobilized by stress, both protecting him from reality and preventing him from coping with it. This critically interferes with learning, with considering relevant facts, and with making rational decisions."

(Emphasis added.)

The following day, petitioner's defense team requested an aid-and-assist hearing, which was held on May 22, 1995. At the hearing, Janzer testified that he had been unable to reach a definitive diagnosis of petitioner and that—given Janzer's affiliation with petitioner's defense team—he did not believe that petitioner would cooperate with him further. Nevertheless, Janzer testified that petitioner's diagnosis was "a matter of possibilities, but it's certainly in a paranoid family." Specifically, Janzer was unable to determine whether petitioner suffered from a delusional disorder or simply a paranoid personality disorder. Despite that uncertainty, Janzer did not believe that petitioner was able to aid and assist in his defense:

> "[Martz:]   Now, Doctor, if I can just maybe—and correct me if I am wrong—but it appears that[,] is it not your opinion that [petitioner] has some form of either personality disorder or mental illness that prevents him from aiding and assisting in his defense, but that it will take more time and more observation before it sounds like you have formed the beginnings of an opinion to what the problem is but it is going to take more time to try to figure out the exact diagnosis so the diagnosis for the disorder is still sketchy, correct?

"[Janzer:] Right.

"[Martz:] But as to the effects of that disorder concerning aid and assist, it is your opinion at this time that he is not able to aid and assist?

"[Janzer:] Definitely."

Given the difficulties that he had had in reaching a diagnosis, Janzer testified that, in his opinion,

"the logical and reasonable and I think legal thing to do would be to have [petitioner] sent to the Oregon State Hospital where they would have a lot more opportunity to observe him, maybe over 30, 60 days, something like that. The effects of medication might make a real difference by reducing anxiety and making it easier for him to take in new information and process it more logically."

The trial court agreed with Janzer and ordered defendant to be transported to the Oregon State Hospital for an aid-and-assist evaluation. Although defendant refused to cooperate with hospital staff in the evaluation, he was observed at the hospital over a period of approximately three weeks. During that time, petitioner participated in various psychiatric, psychological, and social-work assessments. After reviewing those assessments—as well as a number of petitioner's prior arrest, juvenile, school, and medical records—psychologist Richard Hulteng diagnosed petitioner with an antisocial personality disorder with paranoid features. Hulteng concluded that

"[w]hile it is likely that [petitioner] will be a demanding and, at times, quite difficult client, he appears capable of understanding the nature of the proceedings against him, and of cooperating and assisting counsel if he so chooses. Accordingly, it is not recommended that [petitioner] be found incompetent to stand trial."

At a second hearing, at which Janzer and Hulteng offered their competing diagnoses of petitioner, the trial court found defendant competent to stand trial. Subsequently, at petitioner's penalty-phase trial, Hulteng testified extensively about his diagnosis of petitioner.

With that background in mind, we turn to the specifics of petitioner's post-conviction claim. Petitioner set

out the underlying claim in his operative petition for post-conviction relief:

> "Trial counsel initiated an aid and assist hearing to determine petitioner's competency without adequately considering the merits of that motion in relation to the harm it would cause during petitioner's penalty phase. As a result, petitioner was subjected to a prolonged evaluation by prosecution expert witness, Hulteng, on issues of future dangerousness and rebuttal of defense mitigation. Based upon his access to petitioner, Hulteng was able to effectively negate the testimony of petitioner's penalty phase expert witness, Janzer, on issues of future dangerousness and mitigation."

(Emphasis added.) To prevail on that claim, petitioner was required to establish, by a preponderance of the evidence, that trial counsel "failed to exercise reasonable professional skill and judgment" when they requested the aid-and-assist hearing and that that failure had a tendency to effect the result of petitioner's trial.

In his trial memorandum before the post-conviction court, petitioner focused primarily on the second of those showings, emphasizing that, because of petitioner's lengthy evaluation at the Oregon State Hospital, Hulteng was able to present "a much more credible evaluation than that prepared by Janzer" during petitioner's penalty-phase trial. As to the first showing, petitioner argued that "[c]ounsel's decision to have petitioner subjected to an aid and assist evaluation was objectively unreasonable," because, when counsel requested the aid-and-assist hearing, "Janzer's examination was still incomplete and he was still trying to figure out his diagnosis at the time of the hearing."

The post-conviction court rejected petitioner's claim, reasoning:

> "Dr. Janzer was hired on February 23, 1995. He had not completed his examination process of Petitioner at the aid and assist hearing on May 22, 1995. The hearing was necessitated in no insignificant degree because Petitioner voluntarily 'refused to cooperate with [Counsel]' and with Dr. Janzer. Dr. Janzer supported the decision on aid and assist and noted that Petitioner believed that Trial Counsel lied to him.

"* * * * *

"Based upon Dr. Janzer's letter, Counsel had an obligation to bring up the aid and assist issue. The fact that there are two sides to bringing up the issue is beside the point. Petitioner has a constitutional right to be able to aid and assist in a criminal case. When the hired expert questioned the Petitioner's ability to assist counsel, the issue should be raised."

On appeal, petitioner renews the argument that he made at his post-conviction trial.[1] Specifically, petitioner challenges the post-conviction court's conclusion that trial counsel had an obligation to raise the aid-and-assist issue. Petitioner grounds that challenge in Oregon's aid-and-assist statute, ORS 161.360, which provides that "[a] defendant may be found incapacitated if, *as a result of mental disease or defect*, the defendant is unable" to understand the nature of the proceedings against him or to aid and assist in the preparation of his defense. (Emphasis added.) Because Janzer's report did not "opine that petitioner's 'psychopathology' or 'paranoid ideation' constituted, or resulted from, a 'mental disease or defect,'" petitioner contends that trial counsel was not obligated to raise the issue of petitioner's ability to aid and assist in his defense. Further, noting that Janzer ultimately diagnosed petitioner with a paranoid personality disorder—a condition excluded from the statutory definition of "mental disease or defect," ORS 161.295(2) (excepting from the definition any "abnormality constituting solely a personality disorder")—petitioner

---

[1] The state argues that, in his articulation of the claim on appeal, petitioner is raising a new claim that he did not assert in his petition for post-conviction relief—*viz.*, that trial counsel lacked a reasonable basis to request an aid-and-assist hearing—and, consequently, that we cannot consider petitioner's claim on appeal. *See* ORS 138.550(3) (requiring that all grounds for post-conviction relief "be asserted in the original or amended petition, and any grounds not so asserted are deemed waived"). In response, petitioner argues that whether trial counsel had a reasonable basis to initiate competency proceedings was an "implicit premise" of his claim that trial counsel failed to "adequately consider[] the merits" of their decision to initiate competency proceedings. He also argues that, in any event, "this court still must examine the objective reasonableness of [trial counsel's] concerns" in determining whether trial counsel "adequately considered the merits" of their decision to initiate the aid-and-assist hearing. We agree with petitioner. As we understand it, the crux of petitioner's argument—under either characterization—is that the lack of a concrete diagnosis in Janzer's report rendered unreasonable trial counsel's decision to initiate aid-and-assist proceedings.

contends that, despite Janzer's report, trial counsel lacked a reasonable basis to initiate the aid-and-assist proceeding.[2]

In response, the state argues that, given the Fourteenth Amendment's prohibition on trying mentally incompetent criminal defendants, *Pate v. Robinson*, 383 US 375, 384-86, 86 S Ct 836, 15 L Ed 2d 815 (1966), trial counsel were "obligated to inform the court if counsel reasonably question[ed] whether [petitioner was] legally incompetent." Thus, because "[p]etitioner does not contest that trial counsel developed concerns over [petitioner's] ability to aid and assist in his own defense," and because the post-conviction court's findings to that effect are supported by evidence in the record, the state contends that trial counsel were "constitutionally obligated to inform the trial court of their concerns."

We begin by noting that, despite the parties' emphasis on the issue, we need not determine whether trial counsel was "constitutionally obligated" to initiate the aid-and-assist proceeding. Instead, our task is to determine whether petitioner established, by a preponderance of the evidence, that trial counsel's decision to initiate the aid-and-assist proceeding—viewed in the light of trial counsel's perspective at the time that they made that decision—constituted a failure to exercise reasonable skill or judgment. *Montez*, 355 Or at 7; *Lichau*, 333 Or at 359-60. We conclude that he did not.

Although petitioner correctly notes that Janzer had not reached a definitive diagnosis of petitioner at the time that trial counsel requested the aid-and-assist hearing— and that the ultimate diagnosis of petitioner did not constitute a "mental disease or defect" under Oregon's statutory definition of that term—those facts alone were insufficient to carry petitioner's burden of proof. Viewed from trial counsel's perspective at the time that they made their decision to

---

[2] As he did at the post-conviction trial, petitioner spends the bulk of his argument thoroughly cataloging the "damaging psychological information" that Hulteng was able to obtain and present at the penalty phase of petitioner's trial as a result of Hulteng's examination of petitioner. Because we conclude that trial counsel's decision to initiate the aid-and-assist hearing did not constitute inadequate assistance of counsel, we need not set out the particulars of that argument in detail.

request a hearing, *viz.*, in the context of petitioner's impending criminal trial, we conclude that trial counsel could, in a reasonable exercise of professional judgment, conclude that an aid-and-assist hearing was necessary. As the post-conviction court found, trial counsel was faced with a client who "refused to cooperate" in the preparation of his defense nearly from the outset of their representation of him. The expert whom trial counsel retained produced a report concluding that petitioner's "long-standing psychopathology prevents him from emotionally appreciating his legal situation and from assisting his attorney in preparing his legal defense." Further, although Janzer had not reached a definitive diagnosis of petitioner, no diagnosis was forthcoming because petitioner had stopped cooperating with Janzer. Added to that is the very real time pressure that trial counsel faced: Petitioner's trial was scheduled to begin in early July 1995, and Janzer's report was produced in mid-May 1995, approximately six weeks before the scheduled trial date. Viewed in that light, trial counsel's decision to act to ensure that petitioner was capable of aiding and assisting in his defense represented a reasonable exercise of professional judgment.

B. *Failure to call expert witnesses regarding intoxication defense*

We turn next to petitioner's contention that the post-conviction court erred in denying his claim of inadequate assistance of counsel based on trial counsel's alleged failure to adequately prepare his intoxication defense. As set out in his petition for post-conviction relief, petitioner contends:

"Trial counsel failed to adequately prepare for and present an intoxication defense to the jury as follows:

"(a)   Trial counsel failed to obtain the services of an expert witness on toxicology. Had counsel obtained the services of such an expert, counsel would have learned that petitioner's blood-alcohol level at the time of the criminal incidents was approximately a .26 and that such a blood-alcohol level is indicative of extreme intoxication. Counsel would further have learned that as a result of such severe intoxication, petitioner's capacity to control his behavior

and appreciate the criminality of his conduct was severely impaired, thereby negating the *mens rea* required for his conviction offenses. Counsel failed to present any expert testimony regarding intoxication at petitioner's trial."

The post-conviction court addressed that claim at length in its written opinion, ultimately concluding that petitioner had failed to establish that there was a reasonable likelihood that the proffered testimony of petitioner's experts would have affected the jury's verdict, given the "overwhelming contrary evidence of Petitioner's ability to form an intent." In reaching that conclusion, the post-conviction court set out some of the "mountain of facts * * * regarding [petitioner's] ability to carry on and make decisions during the 2 hours of the four assaults and two murders." For example, the post-conviction court noted the following: After being asked to leave the bar, petitioner was heard saying "something to the effect of 'I'm going to go back in there and kick that guy's ass.'" After the first murder, petitioner returned to his grandmother's house, where he located a bottle of alcohol and grape juice, made and consumed a drink, broke a glass, and cleaned the resulting mess. When petitioner's grandmother asked Whitcher to leave the house, petitioner told her that he wanted to walk Whitcher home. After killing Whitcher, petitioner stole Whitcher's wallet, returned home, hid his knife and the wallet, changed out of his bloody clothes, and placed the clothes in the washing machine.

After reciting those facts, and others, the post-conviction court concluded:

"These facts include decisions and actions of Petitioner which began before the first assaults and lasted for several hours, collectively and individually demonstrating an ability to act deliberately and intentionally and for self-protection including destroying evidence and killing his accomplice. * * * From these acts the jury reasonably found that Petitioner had the requisite intent to kill Mr. McDonald and Mr. Whitcher. There is no reasonable likelihood that an expert of the type claimed, or the specific information which could have been elicited would have had any beneficial effect on the jury's determination of intent for those murders."

On appeal, petitioner raises a number of challenges to the post-conviction court's reasoning. He argues that the facts on which the post-conviction court relied to reject his claim illustrate the importance of the expert testimony— *viz.*, to explain why petitioner's ability to engage in such purposeful, goal-directed activity did not necessarily mean that petitioner had the ability to form intent. In support of that argument, petitioner identifies portions of an affidavit submitted to the post-conviction court by a medical doctor, Gary Jacobsen, in which Jacobsen noted that "[o]ne does not have to demonstrate gross signs of intoxication * * * in order to be significantly impaired from alcohol," and that petitioner's cognitive, emotional, and perceptual functioning would have been "extremely impaired." In turn, the state responds that it did not contest petitioner's severe level of intoxication at trial but, rather, introduced much of the evidence that established petitioner's intoxication. As to the effect of alcohol on petitioner's cognitive, emotional, and perceptual functioning, the state contends that, because alcohol consumption is not uncommon, the jury was fully capable of assessing impairment, given the evidence that was presented.

Finally, the state argues that trial counsel's decision not to introduce expert testimony was the sort of reasonable tactical decision that post-conviction courts should not second guess. In support of that argument, the state points to an affidavit submitted by Martz to the post-conviction court:

> "[P]etitioner claims that we should have presented expert testimony in support of the intoxication defense. Petitioner is correct that we did not present that evidence. While we may have contacted a Mr. Larsen regarding the intoxication defense, *we decided not to present the expert testimony because the state would then be allowed to provide [its] own expert to refute our claims.* Given that we had serious doubts that a jury would buy the intoxication defense to begin with, we were concerned that the jury would find the testimony of a state expert on why petitioner had the full intent to commit the murders more credible than our expert's testimony that petitioner might not have had the intent to commit the crimes due to intoxication."

(Emphasis added.) Further, Martz noted that the jury had already heard testimony that petitioner had consumed a

substantial amount of alcohol, "including the testimony of a convenience store clerk (who was likely very credible, given that he appeared to have no bias in the case) that he had refused to sell petitioner alcohol several minutes before the McDonald murder because petitioner was so drunk." In light of those assessments, the state argues that, although trial counsel reasonably *could have* decided to call an expert witness to testify about petitioner's level of intoxication, counsel's decision not to do that was nonetheless a reasonable tactical decision.

Petitioner acknowledges the quoted portions of Martz's affidavit but contends that it "hardly constitutes a *reasonable* tactical decision, where counsel ultimately opted to present an intoxication defense," because, "without expert testimony, the state easily would eviscerate [the] intoxication defense." As to Martz's stated concern that the state would introduce its own experts to challenge any defense experts, petitioner contends that the resulting tactical decision was untenable because "the same can be said of raising *any defense*," and that, "once the decision to pursue the intoxication defense was reached, trial counsel were obligated to support it with all available resources." We disagree.

It is well established that a reviewing court will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment. *Krummacher*, 290 Or at 875-76. Among the universe of reasonable tactical decisions is the decision not to present expert evidence. *Gorham*, 332 Or at 568 (concluding that trial counsel's decision not to call expert witness to present mitigation evidence was a reasonable tactical decision); *Bonin v. Calderon*, 59 F3d 815, 834 (9th Cir 1995) ("[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."). Nonetheless, tactical decisions must be grounded on a reasonable investigation. *Id.* at 835; *Stevens v. State of Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995). The question in each case is whether trial counsel's investigation was legally and factually appropriate to the case. *Stevens*, 322 Or at 108.

Here, there is evidence in the record that trial counsel contacted an intoxication expert and considered the tactical advantages and disadvantages of calling an expert witness to testify about petitioner's level of intoxication and "decided not to present the expert testimony because the state would then be allowed to provide [its] own expert to refute our claims." Although petitioner contends that that decision was not reasonable because that reasoning could apply to any defense, the relevant concern animating trial counsel's decision was not simply that calling an expert witness would allow the state to present expert testimony in rebuttal. Instead it was that, in light of the facts of petitioner's case, "the jury would find the testimony of a state expert on why petitioner had the full intent to commit the murders more credible" than a defense expert. In light of those concerns, and the other evidence presented on petitioner's level of intoxication, trial counsel's decision not to present expert testimony about petitioner's level of intoxication was a reasonable tactical decision. *See, e.g., id.* at 109 ("A 'tactical decision' in the course of an investigation is a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.").

C.  *Trial counsel's failure to "federalize" motion for judgment of acquittal*

We turn next to petitioner's contention that the post-conviction court erred when it denied his claims of inadequate assistance of counsel based on trial counsel's failure to raise federal law in their motion for a judgment of acquittal as to two of petitioner's aggravated murder convictions—Counts 18 and 19. Those counts alleged that petitioner committed aggravated murder by "unlawfully and intentionally caus[ing] the death of" McDonald and Whitcher, respectively, "in the course of the same criminal episode." At the close of the state's case-in-chief, trial counsel moved for a judgment of acquittal (MJOA) on all counts, arguing that "no juror could find beyond a reasonable doubt, based on the Court's instructions and the State's evidence, there is * * * even a prima facie showing that would allow these counts to go to the jury for their consideration." Trial counsel then

made a number of additional arguments pertaining to specific counts. As to Counts 18 and 19, trial counsel added that "the State has failed to show that this is the same criminal episode, the linkage between McDonald and Whitcher." The trial court denied defendant's MJOA as to those counts.

In his operative petition for post-conviction relief, petitioner claimed that the conduct of his trial counsel was inadequate:

"Trial counsel failed to move for judgments of acquittal on Counts 18 and 19 on the basis that the evidence in the record was legally and factually insufficient to establish that petitioner had murdered two persons in the same criminal episode *and that conviction on those counts therefore*[] *violates petitioner's right to due process under the Sixth and Fourteenth Amendments to the United States Constitution.* Because counsel did not move for acquittal on the above basis, petitioner received death sentences on those counts. Had counsel so moved for judgments of acquittal, the trial court would have been require[d] to grant the same."

(Emphasis added.)

Before the post-conviction court, petitioner argued that, in order to be convicted of aggravated murder under ORS 163.095(1)(d), as alleged in Counts 18 and 19, the state was required to prove that each murder occurred during the "same criminal episode," as defined in ORS 131.505(4). Petitioner argued that, because the murders of Whitcher and McDonald were separated by more than two hours and occurred in different locations, "[u]nder the definition of 'same criminal episode' the McDonald and Whitcher homicides simply cannot be construed to have occurred in a continuous and uninterrupted course of conduct. Counsel were obligated to move against Counts 18 and 19 on [that] basis."

The post-conviction court rejected petitioner's claim, because it concluded that petitioner had failed to establish that any failure by trial counsel was likely to have affected the result of petitioner's trial:

"The issue then is whether it would have made a difference if Counsel had raised these arguments at the Trial Court. This Court determines that it reasonably would not have made any difference. The events involving Petitioner

assaulting and stabbing three people and killing one of them at about 10:30 p.m., involves the same criminal episode as the events thereafter: Petitioner running away, continuing drinking and killing his 'accomplice' * * * at about 1:30 a.m."

On appeal, as he did before the post-conviction court, petitioner spends the bulk of his argument challenging that reasoning.

However, our task is to determine whether petitioner established, by a preponderance of the evidence, that trial counsel failed to exercise reasonable professional skill and judgment—and that petitioner suffered resulting prejudice—when counsel failed to argue that "the record was legally and factually insufficient to establish that petitioner had murdered two persons in the same criminal episode and that conviction on those counts therefore[] violates petitioner's right to due process under the Sixth and Fourteenth Amendments to the United States Constitution." As noted, trial counsel *did* argue that "the State has failed to show that this is the same criminal episode, the linkage between McDonald and Whitcher." Accordingly, petitioner's claim reduces to whether trial counsel provided deficient representation when they failed to expressly ground that argument in petitioner's due process rights under the Sixth and Fourteenth Amendments. We conclude that petitioner did not establish that trial counsel was inadequate or ineffective for failing to do that.

Petitioner also failed to establish that, had counsel expressly grounded the MJOA motion in his due process rights, it would likely have affected the result of his trial. Whether the trial court understood trial counsel's arguments to stem from federal due process or Oregon law, the inquiry was the same: Did the state introduce enough evidence to allow a rational juror to find that the two murders were committed during the same criminal episode. *See State v. Bistrika*, 262 Or App 385, 400, 324 P3d 584, *rev den*, 356 Or 397 (2014) (noting the standard for granting an MJOA as "whether a rational factfinder could find that the state proved every element of the offense beyond a reasonable doubt"); *Jackson v. Virginia*, 443 US 307, 316, 99 S Ct 2781, 61 L Ed 2d 560 (1979) (federal due process

requires "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense"). In rejecting petitioner's MJOA—whether under Oregon law or the federal due process standard—the trial court concluded that the state had introduced enough evidence to survive the motion. Thus, even if petitioner is correct that the MJOA *should* have been granted, and that the post-conviction court erred in concluding otherwise, he has failed to establish that, had trial counsel expressly cited the federal constitution as authority in the MJOA, it would have affected the trial court's ruling. Hence, the post-conviction court did not err in rejecting petitioner's claim.

D. *Trial counsel's failure to prepare for and present evidence at the penalty phase of petitioner's trial*

Finally, we turn to petitioner's contention that the post-conviction court erred when it denied his claim for post-conviction relief based on trial counsel's alleged failure to adequately prepare for and present mitigation evidence during the penalty phase of petitioner's trial. Before addressing the substance of that claim, we first set out the efforts of petitioner's defense team to prepare for the penalty-phase proceeding and summarize the evidence that was ultimately presented.

1. *Investigation and presentation of penalty-phase evidence*

At the post-conviction trial, Martz testified that he and Dickison had assigned to investigator Beers the task of "developing information about [petitioner's] background, his family, his past life, looking for any witness or evidence * * * that would be favorable to him. Somebody that could come in and say * * * that he is a good person or has good character or * * * some information that would come forward that we thought would benefit him." As Beers began gathering that information, Martz and Dickison would meet with her to get updates on her interviews of potential witnesses, review her reports, and collectively determine "what to go do next." In a series of reports provided to Dickison—spanning 85 pages and entailing multiple interviews—Beers detailed meeting

with and interviewing petitioner on a number of occasions and interviewing various family members and acquaintances from petitioner's past. Specifically, Beers provided summaries of her interviews with petitioner's uncle, grandmother, mother, father, pediatric dentist, several childhood friends, an employer, a former girlfriend, several individuals whom petitioner had stabbed on previous occasions as well as the father of one of those victims, and a high-school friend of petitioner's sister. Additionally, Beers documented her unsuccessful attempts to interview petitioner's sister, as well as her attempt to obtain petitioner's father's medical records, which had been destroyed.

In addition to the information gathered in those interviews, counsel "subpoenaed and ultimately received piles of documentation dating from [petitioner's] childhood on up" in an attempt to explain the source of petitioner's anger and behavioral problems. Those included "hundreds of pages of CSD, Juvenile, School and Medical records regarding petitioner and his background."

Eventually, Martz and Dickison told Beers to stop looking for additional mitigation evidence in petitioner's past. As Beers explained at the post-conviction trial, "it was turning up that I was finding people about more incidents regarding [petitioner] and kind of like more bad things * * *. [People who were contacted] were scared of [petitioner], and they didn't want to have anything to do with him or didn't want to talk to me or anything, because there had been a couple of them, past problems, and they didn't want any retaliation from him." Testifying generally about the evidence that Beers had uncovered, Martz explained, "I think the way we viewed a lot of the information, and it's kind of a general recollection on my part, is everything seemed to be a two-edged sword; that for every positive thing we could bring up, and quite frankly there wasn't a lot, it could be turned around and used as something that would not be helpful." Likewise, Dickison explained that Beers's investigation had become problematic to her because "everyone [whom petitioner] referred us to, to talk to[,] wanted the District Attorney's [phone] number because they wanted to testify against [petitioner]. So we pretty much ceased going [down] that avenue."

Dickison explained that she began "worrying about" the penalty-phase of petitioner's trial at the beginning of her representation of petitioner and that she had assigned to Beers the task of locating mitigation evidence. She explained that her general strategy was to "portray a sympathetic young man who grew up with many problems and someone who deserved not to die for what had happened," but, as noted above, they had had trouble locating mitigating evidence. As to the possibility of calling petitioner's family members to testify on his behalf, trial counsel "had hoped to put on [petitioner's] mother or his grandmother and sister, but * * * right at the last minute we decided not to." As to petitioner's mother and grandmother, Dickison explained that the grandmother had testified before the grand jury, that petitioner had made a number of admissions to her, and that Dickison's "general thought was that neither of them would be helpful."

At the penalty-phase proceeding, over three days, the state called 27 witnesses to testify how petitioner had assaulted people in various ways throughout his life—both while incarcerated and in the community. Specifically, the jury heard that, while incarcerated, petitioner had assaulted and threatened jail and prison staff—including in one incident punching a jail deputy in the head and, in another, kicking a deputy in the thigh—and that petitioner had engaged in numerous fights with other inmates, including one in which he had thrown boiling water in another inmate's face. They also heard that, before the McDonald and Whitcher homicides, petitioner had, on three different occasions, stabbed three separate people; that he had, on multiple occasions, physically assaulted his ex-wife and a former girlfriend; that he had used a stick to strike a pregnant woman in her stomach and her companion in the head when they came to his home to visit his sister; and that he had made various threats against his teachers, the victims of his assaultive behavior, and others.

Petitioner then introduced the testimony of three witnesses: Janzer, who, as noted, had examined petitioner initially to ensure that he was able to aid and assist in his defense; Dr. Frank Colistro, a psychologist who provided contract services for the Oregon State Penitentiary involving

the evaluation and treatment of inmates; and an inmate who had been involved in a fight with petitioner while in prison. As to the two experts, the post-conviction court summarized their testimony:

"[Trial counsel] first called Dr. Norman Janzer, a psychiatrist who had evaluated petitioner. He had diagnosed petitioner as having a 'borderline personality disorder,' which explained petitioner's longstanding behavioral problems. As part of his discussion of that diagnosis, Janzer mentioned petitioner's difficult family relationships and his problem with alcohol (a common feature for those suffering from borderline personality disorder), as well as the fact that 'some mixed-up family setting' always is associated with borderline personality disorder. He also noted that petitioner was stuck at a very primitive level of emotional development. Janzer opined that petitioner's disorder, although rather severe, was treatable in a controlled environment like prison, acknowledging that treatment for the particular disorder generally is a long, difficult process. He stated, however, that quite often those suffering from the disorder 'grow out' of it in their thirties or forties. When asked whether petitioner 'would pose a threat in the future of engaging in violent acts,' Janzer said: 'Well, if he follows the textbooks about borderline personality disorder, he should be much more mellow by the time he's in his forties.'

"Petitioner's counsel next called Dr. Frank Colistro, a psychologist who did contract work for the Oregon State Penitentiary that involved evaluation and treatment of inmates, including those on death row. He testified that, although he had not personally met with petitioner, he believed that borderline personality disorder was treatable (although treatment was very difficult). He further testified to the various treatment programs—including some for personality disorders—that were available at the prison."

Finally, counsel called an inmate who had been involved in a fistfight with petitioner while both had been incarcerated. The inmate testified that the fight had been the result of "bad words" and that the inmate believed that he had initiated the confrontation with petitioner.

During the post-conviction trial, petitioner contended that, because of their failure to prepare for the penalty-phase proceeding, petitioner's trial counsel had

failed to present a significant amount of mitigation evidence that was present in or evident from the reports and records that Beers had accumulated.[3] As identified by petitioner, that mitigation evidence can generally be divided into two categories: First, testimony from petitioner's family regarding their love for petitioner, his character and background, and the effect that his execution would have on them. Second, evidence relating to petitioner's dysfunctional upbringing and other challenges, as well as his multi-generational family history of mental illness and substance abuse, which would provide historical background and context for the development of petitioner's diagnosed personality disorder.

In support of that claim, petitioner presented affidavits of a death-penalty mitigation specialist, as well as various mental-health experts, which generally explained and amplified the mitigation evidence in counsel's possession at the time of the penalty-phase trial. He also presented affidavits and testimony from family members in which they said that they would have testified, if called during the penalty-phase trial, that petitioner's execution would devastate them. In response, the state argued that, given extensive damning penalty-phase evidence presented by the state, trial counsel adopted the reasonable strategy of tailoring their penalty-phase presentation solely toward the issue of future dangerousness. In its findings of fact and conclusions of law, the post-conviction court adopted the state's reasoning, noting that

> "[a]t the penalty phase of petitioner's trial, his counsel's approach was obvious and straightforward: to convince the jury that although petitioner had a serious personality disorder, which was responsible for his history of violent conduct, his disorder could be treated in prison and successful treatment would eliminate his violent conduct."

Reviewing the evidence that petitioner had presented, the post-conviction court rejected petitioner's claim, concluding

---

[3] Petitioner also argued that Beers's investigation was itself inadequate, because Beers lacked experience as an investigator in capital proceedings. The post-conviction court disposed of that argument, concluding that petitioner had failed to present sufficient evidence to prove that claim because the evidence on which petitioner relied in the post-conviction trial was derived from Beers's investigative efforts. Petitioner renews that argument in a single sentence on appeal, and we reject it without further discussion.

that trial counsel had made a reasonable tactical decision that explained the failure to introduce the identified evidence:

> "That evidence, although perhaps of some mitigating value, realistically would have had little impact in a case where the state had presented a mountain of evidence establishing petitioner's lengthy and continuing history of extremely violent conduct in and out of an incarcerated setting.

> "For that reason, *counsel reasonably could have viewed the evidence as having limited value overall and no real value on the future dangerousness question* (given that the evidence would serve only to explain why petitioner was the way he was, and would not add much if anything to the analysis of whether petitioner's personality disorder—the root of his violent behavior—was treatable, which undeniably was the critical question for the jury at petitioner's penalty phase). And based on that view of the evidence, it was well within the bounds of reasonable professional skill and judgment for counsel to decide, as a matter of strategy, to limit the defense case at penalty phase to expert testimony directly relevant to the future dangerousness question."

(Emphasis added.)

On appeal, petitioner challenges that conclusion, arguing that the post-conviction court's finding that trial counsel made a tactical decision not to introduce the proffered evidence is not supported by the record and, in any event, that such a tactical choice was unreasonable. Before addressing petitioner's argument on appeal, we must resolve a disagreement between the parties over the proper test for determining whether the challenged conduct was the type of tactical decision-making that post-conviction courts do not second guess in the context of an inadequate assistance of counsel claim under Article I, section 11.

2. *Standard for evaluating reasonable tactical decisions of counsel*

In order to be considered an exercise of professional skill and judgment for purposes of a claim of inadequate assistance of counsel under Article I, section 11, "a lawyer's tactical decision 'must be grounded on a reasonable

investigation.'" *Lichau*, 333 Or at 360 (quoting *Gorham*, 332 Or at 567). Thus, "tactical decisions made in the course of preparing for trial must involve 'a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.'" *Id.* (quoting *Stevens*, 322 Or at 109).

Given that standard, petitioner argues that the post-conviction court erred in rejecting his claim on the basis that trial counsel *"could have* reasonably concluded" that the evidence would add little or nothing to their penalty-phase case. Petitioner contends that, under *Lichau*, in order for the post-conviction court to have concluded that trial counsel made a reasonable tactical decision to narrow the scope of their penalty-phase presentation, there must have been direct evidence that counsel made a "conscious choice" as to each item of mitigation that they did not introduce. Petitioner notes that, as to many items of mitigation evidence that he identified, trial counsel could not recall making specific tactical decisions on whether to introduce it. As to others, petitioner contends that counsel's decisions were unreasonable.

We disagree with petitioner's contention that, under *Lichau*, the record required affirmative evidence that trial counsel made a tactical decision as to each item of mitigation evidence that petitioner contends that counsel was inadequate for failing to introduce or explain. Instead, where there is evidence that trial counsel made an "evaluation of the nature and complexity of the case, the likely costs and potential benefits of" various courses of action, *Lichau*, 333 Or at 560, and adopted a mitigation strategy in the face of that evaluation, a post-conviction court can infer that the decision to pursue individual pieces of mitigation fell within that broader tactical calculus. *See, e.g., Krummacher*, 290 Or at 883 (assistance of counsel not inadequate despite trial counsel's inability to identify whether tactical decision was made to object to individual questions but only that such a decision would have been consistent with counsel's "general practice"); *Hayward v. Belleque*, 248 Or App 141, 155-56, 273 P3d 926 (2012), *rev den*, 353 Or 208 (2013) (affirming denial

of post-conviction relief because post-conviction court's findings that "[t]he type of mitigating evidence that petitioner attempts to rely on in this proceeding is the sort of double-edged sword that requires a calculated tactical decision by trial counsel" and that "trial counsel reasonably could have concluded that presentation of such evidence would have been merely cumulative at best" were supported by evidence in the record); *Adams v. Nooth*, 239 Or App 613, 617-18, 245 P3d 173 (2010), *rev den*, 350 Or 130 (2011) (rejecting claim of inadequate assistance because proffered evidence "would not have appreciably bolstered the defense theory at trial" and "it appear[ed] that trial counsel made a tactical decision to simplify the case").

In arguing to the contrary, petitioner notes that in *Bogle v. Armenakis*, 172 Or App 55, 63, 18 P3d 390 (2001); *Aquino v. Baldwin*, 163 Or App 452, 460, 991 P2d 41 (1999), *modified on recons*, 169 Or App 464, 12 P3d 51 (2000); and *Aikens v. Maass*, 122 Or App 321, 327-28, 858 P2d 148 (1993), *rev den*, 318 Or 350 (1994), we declined to speculate that trial counsel had made a reasonable tactical decision where there was no evidence to support that counsel had done that. However, those cases do not present the same tactical calculus that is present here: In *Bogle* and *Aikens*, trial counsel had failed to object to erroneous jury instructions; in *Aquino*, trial counsel had failed to seek a continuance to allow for production of a fingerprint analysis that trial counsel knew was forthcoming. Unlike those cases, in which, in the absence of direct evidence to the contrary, it appeared that counsel had made *no* conscious decision—tactical or otherwise—here, there is evidence that trial counsel had dedicated significant resources to investigating and gathering potential mitigation evidence and had made a conscious decision to identify and call the witnesses that they did— and not to call those witnesses whom they chose not to call.

3. *Failure to call petitioner's family members*

With that in mind, we address the specific items of mitigation evidence that petitioner presented to the post-conviction court in support of his claim, turning first to petitioner's family members. Petitioner argued that trial counsel provided inadequate assistance of counsel when they failed

to call his grandmother, his sister, his half-sister, and his stepmother to testify about their love for him and the effect that his execution would have on them.

As noted, trial counsel "had hoped to put on [petitioner's] mother or his grandmother and sister, but * * * right at the last minute * * * decided not to." There was evidence before the post-conviction court that that decision was based, in part, on the ability of the state to elicit harmful testimony from them. As the post-conviction court noted, petitioner's grandmother "had reportedly advised the police that she had always thought that Petitioner would lose his temper and kill her * * *. The week Petitioner moved in with her, [she] wrote out her funeral plans for the family, and purchased a cemetery plot." Likewise, trial counsel was concerned that petitioner's sister "might be more harmful than helpful because the prosecution would then be able to examine her about negative incidents involving Petitioner during their childhood." In light of that evidence, the post-conviction court did not err in concluding that trial counsel's decision not to call petitioner's grandmother and sister was protected as a reasonable tactical decision.[4]

As to petitioner's stepmother and half-sister, petitioner argues that, because the record does not establish that trial counsel had attempted to contact them, trial counsel could not have made a reasonable tactical decision to forgo calling them as witnesses. Further, petitioner contends that the failure to interview them amounted to an unreasonable mitigation investigation and, thus, reflected inadequate assistance of counsel. But, even assuming that trial counsel made no attempt to contact petitioner's stepmother and half-sister, that does not, on its face, amount to inadequate assistance of counsel. As the Oregon Supreme Court recently explained:

"[I]n virtually every complex post-conviction matter, there is always *other* evidence that could have been investigated or introduced. The standard, however, is not whether

---

[4] The post-conviction court rejected petitioner's claim as to his sister on the additional ground that petitioner had failed to prove that she was available to testify on behalf of the defense at the penalty-phase trial, in light of Beers's testimony that petitioner's sister had been unwilling to cooperate meaningfully with the defense investigation.

counsel investigated or introduced every shred of evidence regarding petitioner's background, psychological makeup, or other factors that the jury might possibly have found to be mitigating; rather, the standard under Oregon law is whether petitioner proved by a preponderance of the evidence that his defense counsel failed to exercise reasonable professional skill and judgment."

*Montez*, 355 Or at 16 (emphasis in original).

Here, the record supports the post-conviction court's conclusion that petitioner did not make that showing with respect to counsel's alleged failure to investigate petitioner's stepmother and half-sister. As noted, during her investigation of petitioner, Beers interviewed numerous family members, friends, and acquaintances and developed a file full of mitigation evidence that trial counsel considered to be "a two-edged sword," because it had the potential to harm petitioner's case. Eventually, as Dickison explained, that led trial counsel to stop pursuing that type of mitigation evidence, out of concern that they would discover more damaging information or unearth additional witnesses who would testify on behalf of the state.

In assessing the reasonableness of that decision, we "must make every effort to evaluate [trial counsel's] conduct from [their] perspective at the time, without the distorting effects of hindsight." *Lichau*, 333 Or at 360. Doing so, we conclude that the trial court did not err in rejecting petitioner's claim. Faced with a difficult and often uncooperative client, trial counsel engaged in a thorough investigation of petitioner's family members, ultimately finding little useful mitigation evidence. Although, as petitioner notes, trial counsel was aware that petitioner had lived with his stepmother and half-sister "briefly as a teenager," the decision to stop investigating family members did not amount to a failure to exercise reasonable professional skill or judgment.

4. *Failure to introduce evidence of petitioner's troubled history and other mitigating evidence*

We turn next to petitioner's contention that trial counsel were inadequate for "failing to present significant available evidence" of petitioner's "troubled history." In support of that claim, petitioner presents a list of specific items

that he contends represent recognized types of mitigation evidence. Petitioner argues that that evidence—which he has pulled from the investigative materials that trial counsel compiled before the penalty-phase trial—was "relevant to assessing [petitioner's] moral culpability," *Wiggins v. Smith*, 539 US 510, 535, 123 S Ct 2527, 156 L Ed 2d 471 (2003), and was therefore admissible as mitigation evidence. Petitioner reasons that, because the individual items of evidence that he identifies are "recognized mitigation evidence," the failure to present that evidence constitutes inadequate assistance of counsel.

The Oregon Supreme Court recently addressed—and rejected—a nearly identical argument in *Montez*. There, the petitioner had argued that

> "trial counsel provided inadequate assistance of counsel by failing to investigate and present a long list of other kinds of evidence that the jury should have been able to consider. According to petitioner, that evidence included specific examples of petitioner's personal history of substance abuse and mental illness; his family's history of substance abuse and mental illness; his cultural background; his abusive marriage; his alcohol consumption on the night of the murder; and positive evidence concerning his character."

355 Or at 23-24. In affirming the post-conviction court's denial of the petitioner's claim, the court reasoned:

> "[p]etitioner may be correct that the specific examples or facts cited in his brief were not individually investigated and presented to the jury as part of his mitigation case. However, the broad themes represented by that evidence—petitioner's struggles with drugs and alcohol, his dysfunctional family relationships, and a lifetime of abuse—were all presented, albeit in different forms and with some different details. Taken all together, that evidence provided a foundation for the expert opinion that petitioner was, at the time of his crimes, unable to differentiate between his actions and the childhood traumas that he was mentally reliving. Again, the issue is not whether the evidence could have been presented in a different way, or whether additional facts could have been included, or facts that were included omitted. Under our cases, the applicable standard is whether trial counsel exercised reasonable skill and judgment. In assessing the reasonableness of counsel's actions

under the Oregon Constitution, we 'must make every effort to evaluate [the] lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight.' *Lichau*, 333 Or at 360. The fact that petitioner would, in retrospect, have implemented his mitigation defense in one or more different ways is not a ground for post-conviction relief if counsel acted reasonably in presenting the defense that they did. That is the case here."

*Id.*

For the same reasons, we reject petitioner's argument here. Although petitioner has identified a number of specific items that he contends could have—and therefore should have—been presented to the jury, he acknowledges that the "broad themes represented by that evidence" were presented through Janzer's testimony.

Regarding petitioner's troubled family, Janzer testified that petitioner's records indicated substantial family problems, "so that all of the people who tried to help [p]etitioner as he was growing up bumped up against family problems," and that those issues are "still a big problem with [petitioner]," because he had not "come to terms with his family yet." Janzer testified that petitioner's mother had abused him as a child, and that the abuse had ended when petitioner, at around age 13, punched his mother in the stomach and knocked her to the ground.

As a result of those problems, Janzer testified that petitioner had "spent a lot of time with his grandmother, and then a series of foster homes, none of which worked out very well, and various programs," but that petitioner "was a very difficult * * * boy to help." Janzer testified that, in the records that he had reviewed, petitioner was "turned down [by] probably seven programs in this area [that] decided they couldn't help him." Additionally, Janzer testified that he had seen multiple records of petitioner being hospitalized with "suicidal thinking."

Janzer also testified that petitioner had had difficulty in school, and that he was using drugs and alcohol to "dull his appreciation of reality and to pull down his level of anxiety." He testified that petitioner "started drinking a little bit and a little bit more and a little bit more and finally

he [was] drinking by the fifth * * * of vodka." Although, in Janzer's opinion, petitioner was "kind of young for an alcoholic," he acknowledged that "it does happen."

Janzer then explained the importance of that background:

> "The reason I got lost in the background because that's important. You never meet a borderline personality disorder who doesn't come from some mixed-up family setting. Then as he gets older and is supposed to be more independent the problems show up. And one of the ways of trying to understand why he reacts the way he does is there's a frantic fear of being abandoned or rejected. That seems to be the basic problem with the borderline is that people are going to kick him out or ignore him, things of that order. The relationships are unstable, and he goes between you're either a good guy or a bad guy. You're either idealized or you're the worst. There's nothing in between for him. And that fits in with a lot of his own remarks."

Janzer went on to explain how petitioner's personality disorder leads him to act impulsively, to overreact to rejection—perceived or real—and to engage in "inappropriate displays of anger" that are "disproportionate." To an outside observer of those displays of anger, Janzer testified that "[t]here [is] no explaining why [petitioner] would go to the lengths he did in terms of what seemed to be happening."

Petitioner acknowledges those portions of Janzer's testimony, but he contends that the presentation was incomplete, pointing to numerous other details of petitioner's family history, his own treatment for mental illness, and his developmental delays that were present in the reports that Beers had obtained during her investigation. But, as in *Montez*, the issue before us "is not whether the evidence could have been presented in a different way, or whether additional facts could have been included." 355 Or at 24. Instead, it is "whether trial counsel exercised reasonable skill and judgment" in preparing for and presenting evidence in petitioner's penalty-phase trial. And, having reviewed the record, we conclude that the post-conviction court did not err in concluding that trial counsel did exercise reasonable professional skill and judgment. As the Supreme Court concluded in *Montez*, we also conclude that

"[a]lthough petitioner's post-conviction counsel identified numerous details that could have been handled differently, emphasized or deemphasized, included or excluded during his penalty-phase [proceeding], those details do not demonstrate that defense counsel failed to exercise reasonable skill and judgment in their representation of petitioner." *Id.* at 24-25.

## IV. CONCLUSION

Having considered each of petitioner's post-conviction contentions raised on appeal, we conclude that petitioner has failed to prove that his counsel's performance was constitutionally deficient or that any deficiency had a tendency to affect the outcome of the proceeding, and, hence, the post-conviction court did not err in denying petitioner's claims for post-conviction relief.

Affirmed.